[This opinion has been published in *Ohio Official Reports* at 86 Ohio St.3d 230.]

THE STATE OF OHIO, APPELLEE, *v.* FILIAGGI, APPELLANT.

[Cite as *State v. Filiaggi*, 1999-Ohio-99.]

*Criminal law—Aggravated murder—Death penalty upheld, when—Verdicts on noncapital offenses reversed and cause remanded to three-judge trial panel when only presiding judge entered the verdicts.*

(No. 98-287—Submitted April 13, 1999—Decided July 29, 1999.)

APPEAL from the Court of Appeals for Lorain County, No. 95CA006240.

_____

{¶ 1} This appeal involves charges from two separate incidents concerning the defendant-appellant, James J. Filiaggi, and his ex-wife, Lisa Huff Filiaggi. The first incident resulted in charges of felonious assault and domestic violence; the second incident resulted in charges of aggravated murder, attempted aggravated murder, aggravated burglary, and kidnapping. A three-judge panel convicted defendant and sentenced him to death for the aggravated murder of Lisa Huff Filiaggi ("Ms. Filiaggi").

{¶ 2} Defendant and Ms. Filiaggi married in December 1991. There were two children born during the marriage. Ms. Filiaggi filed for divorce in August 1992, and the divorce was granted in February 1993. Ms. Filiaggi received custody of the children, although defendant had visitation rights. Defendant was required to pay child support. Relations between defendant and Ms. Filiaggi were strained.

{¶ 3} In the spring of 1993, Ms. Filiaggi and the two children moved into the home of Eric Beiswenger. In the fall of 1993, Ms. Filiaggi and Beiswenger became engaged, and shortly thereafter, became the victims of telephone harassment and vandalism. Beiswenger and Ms. Filiaggi suspected that defendant was responsible for the acts, and set up video cameras hoping to capture him on tape. Ms. Filiaggi also carried a tape recorder with her.

**{¶ 4}** In the fall of 1993, Ms. Filiaggi and Beiswenger recorded a phone conversation in which defendant told Ms. Filiaggi that there are going to be "more headaches and heartaches if she tries to get more money out of him."

**{¶ 5}** On December 19, 1993, Ms. Filiaggi and Beiswenger went to the home of defendant's parents to pick up the children after a visit. Ms. Filiaggi carried a tape recorder in her pocket, which recorded the incident. Defendant and Ms. Filiaggi were arguing while defendant put one child in a car seat in the back seat of the vehicle. After putting the child in the seat, defendant grabbed Ms. Filiaggi around the neck and she began screaming. Beiswenger, who was outside the vehicle, grabbed defendant by the waist and pulled him off her. Defendant turned around and struck Beiswenger in the face numerous times. Beiswenger suffered multiple broken bones in his face. The assault ended when defendant's mother came out, grabbed defendant, and yelled at him to stop. The recording of the incident was admitted into evidence.

**{¶ 6}** Beiswenger and Ms. Filiaggi pressed charges against defendant, and he was arrested and indicted for felonious assault and domestic violence. He was released on bond awaiting trial.

**{¶ 7}** The picture window of Beiswenger's house was also broken on numerous occasions. On January 20, 1994, the last time there was an attempt to break the window, the video camera recorded the incident and clearly showed defendant as the person throwing a bottle at the window. Charges were filed against defendant for attempted vandalism, criminal trespassing, and intimidation of a witness.

**{¶ 8}** Two days later, defendant purchased a 9 mm Luger pistol, which had two clips for ammunition. He also purchased ammunition for the weapon, despite the fact that he already possessed another gun. According to the defense theory, he intended to go to Ms. Filiaggi's house and kill himself in front of her.

**{¶ 9}** On January 24, 1994, defendant took a $1,000 cash advance on his

Visa card.  He left $600 to $700 with his girlfriend, Tracey Jones.  At approximately 10:45 p.m., the Lorain Police Department dispatcher received a call from Ms. Filiaggi.  The call was tape-recorded.  Ms. Filiaggi told the dispatcher that her ex-husband, defendant, was at her back door and was breaking into her house.  Defendant broke down the door and entered the house.  Still carrying the telephone, Ms. Filiaggi fled out the front door.  A neighbor, Robert Mutnansky, who lived two doors away, saw Ms. Filiaggi standing in the yard of the intervening neighbor and frantically looking around.  Another neighbor was awakened by someone screaming, "God help me, someone, please, help me, he's going to kill me."  Ms. Filiaggi saw Mutnansky looking out the window and ran towards his front door.  He let her in, and Ms. Filiaggi told him that her ex-husband was after her with a gun.  She looked petrified and ran past him while Mutnansky locked the door behind her.

{¶ 10} Moments later, Mutnansky heard a couple of bangs on the door and the door came crashing in.  Defendant had a gun in his hand and asked Mutnansky where she went.  Mutnansky said he did not know, and defendant told Mutnansky to help find her.  They both started down the hallway.  When they came to a linen closet, with the door partially open, defendant opened the door and found Ms. Filiaggi.  Defendant was very angry and pulled Ms. Filiaggi from the closet by the arm and swung her into the bathroom, which was across the hall from the closet.  There was a struggle.  Mutnansky heard defendant tell Ms. Filiaggi, "This will teach you to fuck with me," and then heard two shots fired.

{¶ 11} Although shot in the shoulder, Ms. Filiaggi was able to get away and run across the hallway into one of the bedrooms.  Mutnansky, standing partially in one of the bedrooms, was pleading with defendant not to shoot her.  Mutnansky was in another bedroom and defendant told Mutnansky to close the bedroom door and stay out.  Mutnansky again heard defendant tell Ms. Filiaggi, "This will teach you not to fuck with me" and heard two more shots.  Mutnansky then heard

footsteps down the hallway. Mutnansky came out of the bedroom and saw Ms. Filiaggi slumped against the wall. She had been shot in the head. Mutnansky attempted to call 911, but noticed a policeman coming through his front door.

{¶ 12} About twenty minutes away, in Amherst Township, Delbert Yepko, Ms. Filiaggi's stepfather, was watching the news. At 11:15 p.m., he heard pounding at the front door. While he had a motion detector light on the side of the trailer, it was not on and the area outside the door was dark. He was home alone, and his house had previously been vandalized, so he picked up a can of red pepper spray and went to the door. He opened the door about three inches and saw defendant. Defendant then bashed the door in.

{¶ 13} Defendant came in the house and said, "Are you ready to die?" Yepko saw a gun in defendant's right hand. Defendant brought the gun up to shoot Yepko and said, "I'm going to kill you." Yepko sprayed defendant in the face with the pepper spray, and defendant shot at him, but did not hit him. Yepko managed to get out of the trailer, without a coat or shoes. He ran to four separate trailers, knocking on doors, finally gaining admittance to the fourth one, where he was able to call 911. He tried to call Ms. Filiaggi, but was shaking too badly.

{¶ 14} On the morning of January 25, 1994, between 8:00 and 9:00 a.m., defendant arrived at the home of Howard R. Matlack, a college friend. Defendant asked Matlack if he could "crash," and he lay down on the couch. Matlack took his girlfriend to work later that morning. His girlfriend later called Matlack and told him that defendant had killed Ms. Filiaggi. Matlack confronted defendant about it. Defendant got up off the couch and a gun fell to the floor. Defendant then left Matlack's house.

{¶ 15} On January 27, 1994, defendant took another $1,000 cash advance. Defendant fled the state, but returned to Lorain, when he discovered that his parents might lose their house, which had been put up for his bond on the previous charges. Defendant had rented a car at the Pittsburgh Airport that was later recovered in an

area near defendant's parents' home. The car contained the rental agreement as well as several rounds of 9 mm ammunition. The murder weapon was never found.

{¶ 16} Defendant entered a plea of not guilty by reason of insanity. He also waived his right to be tried by a jury. A three-judge panel heard the evidence presented on all charges. The three-judge panel entered its verdict on the aggravated murder charge, but only the presiding judge entered a verdict on the remaining charges.

{¶ 17} The three-judge panel found defendant guilty of aggravated murder and the three capital specifications: the offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by defendant (R.C. 2929.04[A][3]); the offense was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by defendant (R.C. 2929.04[A][5]); and the victim of the offense was a witness to prior offenses by defendant and was purposely killed to prevent her testimony in a criminal proceeding concerning those prior offenses (R.C. 2929.04[A][8]). The case proceeded to the penalty phase and the panel sentenced defendant to death. The court of appeals affirmed the convictions and death sentence.

{¶ 18} The cause is now before this court upon an appeal as of right.

_____

*Gregory A. White*, Lorain County Prosecuting Attorney, and *Jonathan E. Rosenbaum*, Assistant Prosecuting Attorney, for appellee.

*Jack W. Bradley* and *Renee W. Green*, for appellant.

_____

**LUNDBERG STRATTON, J.**

{¶ 19} In this appeal, defendant raises twelve propositions of law. We sustain defendant's fourth proposition of law and remand the cause to the trial court. We affirm defendant's aggravated-murder conviction, and after independently reviewing the record, weighing the aggravating circumstances against the

mitigating factors, and examining the proportionality of the death sentence in this case to the penalty imposed in similar cases, we affirm defendant's sentence of death.

*Competency to Stand Trial*

{¶ 20} The trial proceedings were set to begin on July 11, 1995. Defendant had entered a plea of not guilty by reason of insanity; however, the question of competency had not been raised. On the way to the courthouse for the start of the trial, officers shackled defendant and placed a stun belt on him for security purposes. En route, defendant was accidentally shocked by the stun belt. As a result, he was shaken up, and evidence indicated that he might have been placed on Valium. The court recessed until that afternoon. When court resumed, defendant, with his three attorneys present, waived his right to trial by jury. After opening arguments, eight state's witnesses testified. Court then recessed for the day.

{¶ 21} The next morning, July 12, 1995, defense counsel told the trial court that in the opinion of all three defense counsel, defendant was not competent to stand trial, *i.e.*, to understand the nature of the charges against him or to assist in his defense. The court contacted the local forensics center and requested that the defendant be examined to determine if he was competent. The forensics center immediately accommodated the court's request, and court recessed for the day.

{¶ 22} On July 13, 1995, the court held a competency hearing. Defendant gave counsel permission to proceed without him. Dr. Thomas Haglund, who had examined defendant on July 12, testified that he had interviewed defendant for about forty-five minutes. He related that defendant believed that he was still receiving shocks from the stun belt. Dr. Haglund indicated that defendant was quite tense and agitated during the interview. At one point during the interview, defendant began to lose control, breathed more rapidly, and his legs and feet began to shake.

{¶ 23} On cross-examination, Dr. Haglund testified that he did not think

6

that defendant was malingering. It was his opinion that given the state that defendant was in as a result of the stun belt incident, he was concerned about defendant's mental condition and did not think defendant was able to continue with the trial. Although Dr. Haglund had not talked with defendant on the day of the competency hearing, he testified that he believed the defendant's emotional state could be turned around quickly and was on a day-to-day status.

{¶ 24} Dr. Haglund also testified that during the interview, defendant was mentally alert, oriented, and able to answer questions. When questioned, defendant was able to tell Dr. Haglund what he had been charged with and who his attorneys were, as well as give a brief description of the testimony from the day before. Defendant understood that he was under a doctor's care, and identified his doctor and the medications he was currently receiving. Defendant also knew why he was on the medications.

{¶ 25} In response to the prosecutor's questions, Dr. Haglund stated that defendant understood the proceedings against him, and was able to consult with his attorneys and to assist in preparing his defense. Again, on cross-examination, Dr. Haglund testified that he believed defendant to be able to assist in his own defense and to consult with counsel and understand the court proceedings. Defense counsel declined to call any witnesses, nor did counsel offer any testimony to contradict Dr. Haglund's findings or his report that the defendant had slept well and was in acceptable physical condition at the time of the examination.

{¶ 26} The court determined that defendant was competent to stand trial, and that the trial would proceed. Defense counsel requested that Dr. Haglund be given the opportunity to examine defendant again, and also requested that defendant's own treating psychiatrist be given the opportunity to examine him. The court determined that other evidence concerning defendant's medical condition was not relevant on this point. Defense counsel's motion for a mistrial was overruled.

{¶ 27} After one state's witness testified, defense counsel put the following

matters on the record: that defendant was brought into court in a wheelchair with handcuffs, leg irons and a body belt; that in defense counsel's opinion, defendant was incoherent; that he was not following the proceedings and could not communicate or assist defense counsel; that defense counsel did not believe that defendant was malingering; and that his pulse rate was one hundred twenty. Defense counsel again requested a mistrial. The prosecutor responded that defense counsel had several opportunities to speak with defendant throughout the day and never mentioned to the court that defendant was incoherent before the deputies transported defendant to court. The prosecutor stated that, in his opinion, defendant was malingering. The motion for mistrial was denied.

{¶ 28} When the trial resumed on July 14, defense counsel again indicated that he did not think that defendant was competent to proceed. However, defense counsel did not file any additional information to support these allegations. Further, a deputy who guarded the defendant during the noon recess testified that defendant was doing stretching exercises, seemed to be fine, was not shaking, was in control of himself, and was conversing in a normal tone with his lawyers. The court overruled the motion, as well as defense counsel's motion for a mistrial.

{¶ 29} Defense counsel made similar motions concerning defendant's competence and requested a mistrial throughout the course of the trial. Again, these motions were unsupported and, consequently were denied.

{¶ 30} After defendant was convicted and sentenced to death, defense counsel filed a motion for new trial on the grounds that defendant was not competent to stand trial. Attached to the motion were affidavits by his counsel and a physician, and a report by the psychiatrist who had been treating defendant before and during trial. The defendant also attached a report of a radiology examination that was performed on July 21, 1995 (after the date of conviction but before the sentencing phase), which indicated that there had been some change in defendant's brain since a prior examination on March 25, 1995. The affidavits and report

described some physiological observations of defendant during the course of trial, which included increased respiration, elevated pulse, sweating, shaking, and stammering. The trial court denied the motion for new trial.

{¶ 31} Former R.C. 2945.37, in effect at the time of defendant's trial, provided:

"(A) In a criminal action in a court of common pleas or municipal court, the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial. * * * If the issue is raised after trial has begun, the court shall hold a hearing on the issue only for good cause shown.

"A defendant is presumed competent to stand trial, unless it is proved by a preponderance of the evidence in a hearing under this section that because of his present mental condition he is incapable of understanding the nature and objective of the proceedings against him or of presently assisting in his defense.

" * * *

"The prosecutor and defense counsel may submit evidence on the issue of the defendant's competence to stand trial."

{¶ 32} When the question of competency arose, the court, having determined that there was good cause, ordered that defendant be examined. A hearing was held the day after the evaluation. Pursuant to R.C. 2945.37, the defense had the burden of proving that defendant was incompetent. The only witness called during the hearing was Dr. Haglund.

{¶ 33} As stated, Dr. Haglund testified that defendant was competent to stand trial. Dr. Haglund wavered only on the issue of whether defendant was capable of going forward with the trial due to his mental/emotional state. However, this had more to do with the stun belt incident and some follow-up incidents where correction officers attempted to restrain him before transport. These events served as the basis for Dr. Haglund's desire to reexamine defendant, not that defendant had somehow become incompetent from the previous day.

**{¶ 34}** At the time the trial court was called upon to decide defendant's competence, the information indicated that although shaken from the stun belt incident, defendant had come to trial that afternoon, July 11, waived his right to a jury trial, and sat through a half a day of testimony. The court based its determination of competence on those factors, in combination with Dr. Haglund's opinion and the court's own observations of the defendant's behavior. Defendant did not carry his burden of proving incompetence.

**{¶ 35}** After the trial court found defendant competent, defense counsel persisted in their efforts to obtain an additional evaluation of competence. Their requests were based on their own observations of defendant during the trial proceedings. Even though defendant was being treated by a psychiatrist who examined him four days after the stun belt incident, an affidavit by the doctor was not presented until the new trial motion was filed. Based on the evidence presented at the time of the hearing, the trial court's decision was proper.

**{¶ 36}** The record indicates that defense counsel raised concerns about defendant's mental state during the course of the trial. Given that defense counsel are officers of the court, their assertions cannot be dismissed. However, in *State v. Chapin* (1981), 67 Ohio St.2d 437, 21 O.O.3d 273, 424 N.E.2d 317, we held: "An unqualified suggestion of defendant's incompetency to stand trial by defense counsel during trial without additional objective indications such as, but not limited to, supplemental medical reports, defendant's conduct at trial or specific reference to defendant's irrational behavior or the like does not meet the 'good cause shown' standard of R.C. 2945.37." *Id.*, paragraph one of the syllabus.

**{¶ 37}** During the course of the trial, defense counsel filed no additional information to support their allegations of incompetency. Further, defense counsel's statements must be balanced against the court's own observations, as well as the statements of the deputy sheriffs who also observed defendant (although such statements were not under oath). Considering the totality of the evidence, the trial

court did not abuse its discretion in denying the motions for additional evaluation and mistrial.

{¶ 38} While defendant did file additional information with his motion for new trial, the standard of review remains whether the trial court abused its discretion. *State v. Schiebel* (1990), 55 Ohio St.3d 71, 564 N.E.2d 54, paragraph one of the syllabus; *State v. Williams* (1975), 43 Ohio St.2d 88, 72 O.O.2d 49, 330 N.E.2d 891. In the entry denying the new trial motion, the presiding judge considered the additional medical evidence, and still determined that defendant was competent to stand trial. That determination was based on the court's own observations, as well as unrefuted representations of correctional officers who observed defendant showering, eating meals, and conversing with other inmates, correctional officers and, upon request, with his attorneys. The detailed entry of the trial court fails to support defendant's claim that the court's decision was unreasonable, arbitrary, or unconscionable. Thus, we find no abuse of discretion. *State v. Adams* (1980), 62 Ohio St.2d 151, 158, 16 O.O.3d 169, 173, 404 N.E.2d 144, 149. Accordingly, we overrule defendant's first and second propositions of law.

*Jury Waiver Colloquy*

{¶ 39} In his third proposition of law, defendant makes two specific arguments concerning his jury waiver on July 11. First, he argues that a jury waiver in a capital case is not made knowingly, intelligently, and voluntarily unless the defendant is aware of all the implications of the waiver. Second, he argues that because he was accidentally shocked with the stun belt on the morning of trial, and was on Valium as a result, his waiver was not knowing, voluntary, and intelligent.

{¶ 40} Defendant first asserts that this court's decision in *State v. Post* (1987), 32 Ohio St.3d 380, 513 N.E.2d 754, is inconsistent with *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464, paragraph one of the syllabus. We held in *Post*, "[T]his court indulges ' * * * in the usual presumption that in a bench trial

in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.' " *Id.*, 32 Ohio St.3d at 384, 513 N.E.2d at 759, quoting *State v. White* (1968), 15 Ohio St.2d 146, 151, 44 O.O.2d 132, 136, 239 N.E.2d 65, 70. In *Jells*, we held that there is no requirement for a trial court to interrogate a defendant in order to determine whether he or she is fully apprised of the right to a jury trial. Defendant now argues that after this court's decision in *Post*, the defendant must be advised of the presumption of correctness that will attach to the findings of the three-judge panel.

{¶ 41} Since *Jells* holds that no inquiry is required, the trial court's failure to make specific inquiries of the defendant cannot be error. "While it may be better practice for the trial judge to enumerate all the possible implications of a waiver of a jury, there is no error in failing to do so." *Id.*, 53 Ohio St.3d at 26, 559 N.E.2d at 468. Here, the trial judge read the waiver aloud, and asked defendant if "this [was] your desire?" Defendant answered in the affirmative. Pursuant to *Jells*, no more was required.

{¶ 42} Defendant also argues that his waiver was not knowing, intelligent, and voluntary because "the waivers were signed at a time shortly after appellant had been administered the shock of 50,000 volts of electricity from a stun belt he was wearing * * * [and] had just been placed under the influence of Valium." The record supports defendant's claim that he was shocked by the stun belt; however, the record does not indicate the voltage level. The record also indicates that the trial judge stated: "The defendant is shaken, and he may be on Valium." The court took a recess directly after this incident for the remainder of the morning, and the court then reconvened at 1:30 p.m. Immediately upon reconvening, the parties addressed the subject of the waivers and made opening statements. Nothing indicates that defendant was unable to make a decision concerning the jury waiver. Defendant was represented by three attorneys, one of whom was a physician, and

12

they never indicated that defendant would not be able to waive his right to a jury. Further, while defense counsel requested a mistrial and additional evaluations of defendant during the course of the trial alleging incompetence, they never asked the court to revisit the jury waiver issue. The record does not support defendant's claim that his waiver was not knowing, intelligent, and voluntary. Therefore, we overrule this proposition of law.

*Determination of the Charges by One versus Three Judges*

{¶ 43} The presiding judge consolidated defendant's cases. The first case (No. 93CR044726) included charges of felonious assault and domestic violence after an altercation by defendant with Ms. Filiaggi and Beiswenger in December 1993. The second case (No. 94CR044866) involved charges of aggravated murder, attempted aggravated murder, aggravated burglary, and kidnapping on January 24, 1994. Defendant filed a motion to consolidate the cases for trial, which was granted. Defendant waived his right to be tried by a jury in both cases. However, in the second case, the three-judge panel decided only the aggravated murder count and the accompanying specifications. The presiding judge alone determined all the remaining charges (attempted aggravated murder, aggravated burglary, and kidnapping) connected to the death penalty case. In his fourth proposition of law, defendant challenges that procedure. Defendant does not challenge the convictions for felonious assault and domestic violence (No. 93CR044726), the consolidated case.

{¶ 44} It is clear from the jury waiver colloquy that the presiding judge thought that defendant was entitled to a three-judge panel only on the aggravated murder charge, and that he alone should determine guilt on the remaining counts. Defendant signed the waivers. The three trial judges sat and collectively listened to all the testimony as to all the charges, but the panel entered its verdicts only on the aggravated murder charge and specifications. The presiding judge decided the

13

remaining charges.[1]

**{¶ 45}** The state contends that defendant consented to the procedure and therefore waived any error. However, we conclude that this jurisdictional matter cannot be waived.

**{¶ 46}** R.C. 2945.06 provides:

"If the accused is charged with an offense punishable with death, he shall be tried by a court to be composed of three judges, consisting of the judge presiding at the time in the trial of criminal cases and two other judges to be designated by the presiding judge or chief justice of that court, and in case there is neither a presiding judge nor a chief justice, by the chief justice of the supreme court. The judges or a majority of them may decide all questions of fact and law arising upon the trial; *however, the accused shall not be found guilty or not guilty of any offense unless the judges unanimously find the accused guilty or not guilty.*" (Emphasis added.)

**{¶ 47}** In *State v. Smith* (1997), 80 Ohio St.3d 89, 104, 684 N.E.2d 668, 684-685, the defendant argued that even though all charges were present in the same indictment, his noncapital offenses were separate from the capital offenses, and thus he should be allowed to appeal the noncapital offenses to the court of appeals. We held, however, that we had jurisdiction over the entire case, and not just certain counts, charges, or sentences. Here, the statute makes no provision for trying the noncapital counts by a single judge when a three-judge panel tries the capital offenses. In the thirty-eight previous three-judge panel cases reviewed by this court, no previous trial court has interpreted R.C. 2945.06 as did the presiding judge (and the court of appeals) in this case.

**{¶ 48}** We find persuasive the cogent reasoning of another state court that

---

1. The presiding judge found defendant not guilty of the kidnapping charges.

faced a similar situation:

"[W]here it is apparent from the allegations that the matter alleged is within the class of cases in which a particular court has been empowered to act, jurisdiction is present. Any subsequent error in the proceedings is only error in the 'exercise of jurisdiction,' as distinguished from the want of jurisdiction in the first instance. * * *

" '[I]n cases where the court has *undoubted jurisdiction of the subject matter, and of the parties*, the action of the trial court, though involving an erroneous exercise of jurisdiction, which might be taken advantage of by direct appeal, or by direct attack, yet the judgment or decree is not void though it might be set aside for the irregular or erroneous exercise of jurisdiction if appealed from. *It may not be called into question collaterally*.' " (Emphasis *sic*.) *In re Waite* (1991), 188 Mich.App. 189, 200, 468 N.W.2d 912, 917, quoting *Jackson City Bank & Trust Co. v. Fredrick* (1935), 271 Mich. 538, 544-546, 260 N.W. 908, 909.

{¶ 49} We have consistently required strict compliance with Ohio statutes when reviewing the procedures in capital cases. See *State v. Pless* (1996), 74 Ohio St.3d 333, 658 N.E.2d 766, paragraph one of the syllabus.

{¶ 50} Since R.C. 2945.06 mandates that "the accused shall not be found guilty or not guilty of *any* offense unless the judges unanimously find the accused guilty or not guilty," the presiding judge did not have sole authority to enter a verdict on the noncapital charges. Thus, the trial is still incomplete because outstanding charges remain to be decided by the three-judge panel. See *State v. Green* (1998), 81 Ohio St.3d 100, 689 N.E.2d 556, syllabus.

{¶ 51} Therefore, we reverse and remand to the trial panel the verdicts on the non-capital offenses, attempted aggravated murder, aggravated burglary, and kidnapping. Upon remand, the trial panel is required to proceed from the point at which the error occurred. *Montgomery Cty. Commrs. v. Carey* (1853), 1 Ohio St. 463, paragraph one of the syllabus; *State ex rel. Stevenson v. Murray* (1982), 69

Ohio St.2d 112, 113, 23 O.O.3d 160, 431 N.E.2d 324, 325. Thus, the three-judge panel, having already heard all of the evidence, should reconstitute itself and deliberate anew on the charges of attempted aggravated murder, aggravated burglary, and kidnapping. The three-judge panel, as a whole, considered the aggravated murder charge, specifications, and penalty, as required by the statute; therefore, the verdicts on that charge are not affected.

*Inquiry on Waiver of Right to Testify*

{¶ 52} In his fifth proposition of law, defendant argues that he was deprived of due process rights because the trial court did not, *sua sponte*, inquire as to whether his "failure to testify was a result of his own thinking."

{¶ 53} We recently addressed this issue for the first time in *State v. Bey* (1999), 85 Ohio St.3d 487, 499, 709 N.E.2d 484, 497, and held that "a trial court is not *required* to conduct an inquiry with the defendant concerning the decision whether to testify in his defense." (Emphasis added.)

{¶ 54} In this case, nothing in the record suggests that defendant was unaware of his right to testify or that defendant's counsel failed to advise him of his right. Nothing suggests that defendant wanted to testify or was denied the opportunity to do so. Accordingly, we overrule defendant's fifth proposition of law.

*Failure to Admit Psychological Reports*

{¶ 55} Defendant presented a clinical psychologist and three psychiatrists as experts during the defense case. The state called one forensic psychiatrist to testify in rebuttal. At the close of the rebuttal case, the state moved for the admission of the report that its expert had prepared. Defense counsel objected, arguing that the court heard the testimony, but the court admitted the report. At that point, defense counsel asked the court to admit his experts' reports. The prosecutor objected, arguing, "[T]hey had their chance, it's not their case." The trial court denied the defense's request. In his sixth proposition of law, defendant argues that the trial court erred in refusing to permit the admission of the defense experts' reports.

{¶ 56} R.C. 2945.10(C) specifies the order of proceedings at trial: "The state must first produce its evidence and the defendant shall then produce his evidence." "The state will then be confined to rebutting evidence, but the court, for good reason, in furtherance of justice, may permit evidence to be offered by either side out of its order." R.C. 2945.10(D). Moreover, this court has held that "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus.

{¶ 57} The appropriate time for defense counsel to have requested admission of the reports of the defense experts was during the defense's case. While it certainly was within the court's discretion to have admitted the reports at the close of the rebuttal case, the court's refusal to admit the reports does not constitute an abuse of discretion, which would be "more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 173, 404 N.E.2d 144, 149. Defendant has not met that burden here.

{¶ 58} Further, even if the trial court erred in excluding the reports, the error

was harmless.  The court had the opportunity to hear all the witnesses testify in person and, therefore, the information given by the experts was conveyed to the trial court and the reports were merely cumulative.  Accordingly, we overrule this proposition of law.

*Failure to Find Defendant Not Guilty by Reason of Insanity*

{¶ 59} Defendant entered a plea of not guilty by reason of insanity.  A plea of not guilty by reason of insanity is an affirmative defense that must be proven by a preponderance of the evidence.  *State v. Brown* (1983), 5 Ohio St.3d 133, 5 OBR 266, 449 N.E.2d 449.  A person is not guilty by reason of insanity only if he or she proves that "at the time of the commission of the offense, he did not know, as a result of a severe mental disease or defect, the wrongfulness of his acts."  Former R.C. 2901.01(N); 2901.05.

{¶ 60} Four experts testified for the defense, and one for the state.  In his seventh proposition of law, defendant argues that the panel "simply lost its way in the thicket of expertise."  Defendant appears to be arguing that he met his burden of proving the defense of not guilty by reason of insanity by a preponderance of the evidence and that the trial court's finding to the contrary was against the weight of the evidence.

{¶ 61} Defendant offered the testimony of a clinical psychologist (Dr. Marc Robert Pagano) and three psychiatrists (Drs. J. Alexander Bodkin, Paul Jay Markovitz, and Emil F. Coccaro).  None of the defense experts was qualified in the field of forensics.  The rebuttal expert called by the state was a forensic psychiatrist (Dr. Phillip Resnick).

{¶ 62} Dr. Pagano examined defendant and diagnosed him as suffering from intermittent explosive disorder and bipolar disorder at the time the offenses were committed.  Dr. Pagano relied on accounts by defendant, his family, and defense counsel, and did nothing to verify the accuracy of the information.  He specifically stated that he was not giving an opinion on the question of legal

18

insanity.

{¶ 63} Dr. Bodkin also examined defendant and determined that he suffered from bipolar disorder and intermittent explosive disorder. He opined that defendant, because of these diseases, did not know the wrongfulness of his conduct at the time of the murder and attempted murder. Dr. Bodkin also received all of his information used to evaluate defendant from the defendant himself, the defendant's family, and the defense team. He did not believe that defendant was being untruthful or malingering.

{¶ 64} Dr. Markovitz also diagnosed defendant as having bipolar disorder, intermittent explosive disorder, and attention deficit disorder. He testified that, based on defendant's conduct, if he had been treating defendant in the two weeks preceding the murder, he would have hospitalized him as suicidal. He further opined that on the day of the incident with Beiswenger, and on the day of the murder, defendant did not know right from wrong. He based his analysis on the facts of the case, his interview with defendant, defendant's lifelong behavior patterns, biochemical studies, and overview of his life. He also did nothing to verify the information provided by the defense.

{¶ 65} Dr. Coccaro did not examine defendant, but examined his medical and chemical test results. He concluded that defendant suffered from bipolar disorder and intermittent explosive disorder. His testimony echoed the other doctors' testimony concerning defendant's chemical imbalance. However, Dr. Cocarro conceded that it was possible for a person with a history of impulsive aggressive behavior to plan a premeditated, intentional crime that the person knows is wrong.

{¶ 66} Dr. Resnick was the forensic psychiatrist who testified on behalf of the prosecution. Dr. Resnick explained that a forensic psychiatrist evaluates people who are in some form of litigation, either civil or criminal, and the person being evaluated is in the human sense trying to manage the impression he creates, whether

it is to look disabled, more insane, *etc*. Therefore, the forensic psychiatrist, unlike the clinical psychiatrist, does not take at face value what the evaluee reports, but relies more heavily on objective evidence, such as police reports, witnesses' reports, employer reports, and school reports, and does not assume that everything being said is truthful.

{¶ 67} In preparing for his testimony, Dr. Resnick spent five and a half hours with defendant and another two and three-quarter hours with him another day. Dr. Resnick interviewed defendant's mother, father, and girlfriend. He reviewed detailed police reports, witnesses' reports, police records regarding earlier charges, and deputies' accounts of assaults made by defendant. He reviewed a response to a motion to compel the production of records, the indictment, reports of Drs. Bodkin, Markovitz, Pagano, and Coccaro, reports of the hospital dietician, and various other medical reports.

{¶ 68} Dr. Resnick diagnosed defendant as having antisocial personality disorder, alcohol abuse, and attention deficit/hyperactivity disorder of childhood. He further stated that defendant did not suffer from any mental diseases on the day of the killing that would meet the Ohio legal test (for insanity) and that defendant knew the wrongfulness of his conduct. His opinion was that defendant committed the crimes out of vengeance. Defendant expected to go to prison, he expected to lose his job, and the court had already told him that he was not allowed to see his children. Dr. Resnick stated that while defendant was contemplating suicide, he decided, in Dr. Resnick's opinion, to kill Ms. Filiaggi.

{¶ 69} "The weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of the facts." *State v. Thomas* (1982), 70 Ohio St.2d 79, 24 O.O.3d 150, 434 N.E.2d 1356, syllabus. The trial panel clearly expressed what its responsibilities were regarding the findings it needed to make. The court found that "the defendant has failed to prove by a preponderance of

evidence his claim of insanity at the time of the acts involved. This Court specifically finds that the defendant knew of the wrongfulness of his acts in this case."

{¶ 70} Even if the defense experts' diagnoses are taken as true, Dr. Resnick's testimony (as well as that of lay witnesses) concerning the defendant's state of mind at the time of the crime, as well as steps defendant took to evade capture by the police, indicates that defendant knew the wrongfulness of his conduct.

{¶ 71} Dr. Resnick testified that there was no evidence that defendant was confused at the time of the killing. He parked around the corner from his ex-wife's house to keep from being seen. He went to the back door because he knew there was a light by the front door. He pursued Ms. Filiaggi into the home of a neighbor, Mutnansky. When in Mutnansky's home, defendant told Mutnansky to stay in the other bedroom and close the door. Dr. Resnick noted that this showed that defendant did not want anyone to witness the killing. This was also evidence that defendant's actions were not an uncontrolled rage, but a plan aimed at Ms. Filiaggi.

{¶ 72} Dr. Resnick indicated that information contributed by the family could be used to help the clinical experts to determine whether defendant was suffering from a severe mental disease, but the issue of whether defendant knew the wrongfulness of his act would depend in part on his answers regarding his conduct and other objective police data. From the police reports, Dr. Resnick obtained additional information not available to the other experts, indicating the charges against defendant, his checking into a hotel under a false name, and his changing license plates, etc. This evidence demonstrates that defendant knew the wrongfulness of his conduct. In addition, through a telephone call, defendant learned that the police were tracing his whereabouts by his use of a money machine card, so he stopped using that card. Dr. Resnick pointed to this as an example of clear, logical thinking.

**{¶ 73}** Defendant reported no delusions, hallucinations, or false beliefs that caused him to think that killing Ms. Filiaggi was the right thing to do. In fact, Dr. Resnick testified that defendant volunteered to him the statement, "I know right from wrong." Defendant expressed no remorse and Dr. Resnick opined that defendant had revenge for a motive, and not a psychotic motive.

**{¶ 74}** All the defense experts conceded that a person with the mental conditions that they identified in defendant could commit a premeditated murder with the knowledge that it was wrong. We conclude that the evidence clearly showed that defendant did not suffer from any mental diseases that would qualify for the insanity defense under Ohio law and that the defendant knew the wrongfulness of his conduct. Accordingly, we overrule defendant's seventh proposition of law.

*Trial Panel's Opinion*

**{¶ 75}** When a sentence of death is imposed, R.C. 2929.03(F) requires that the court or the three-judge panel issue a separate opinion weighing the mitigating factors and aggravating circumstances in the case, and stating why the aggravating circumstances were sufficient to outweigh the mitigating factors. In his eighth proposition of law, defendant makes generalized complaints concerning the panel's opinion. But none of defendant's complaints has merit.

**{¶ 76}** First, defendant argues that the panel, although making a "generic statement" that the death penalty specifications charged in the indictment were proven beyond a reasonable doubt, made the more specific finding that they were supported by "substantial, credible evidence." In the trial phase of the case, the panel found defendant guilty of the three aggravating circumstances beyond a reasonable doubt. The panel's opinion specifically states: "The panel finds that the Defendant was found guilty *beyond a reasonable doubt* of committing the following aggravating circumstances: * * *." (Emphasis added.) The panel then lists each circumstance and sets forth that there was "substantial and credible

evidence" presented to prove each one. Defendant argues that this constitutes error because substantial, credible evidence is not equivalent to proof beyond a reasonable doubt. We do not agree that the panel's use of the term "substantial, credible evidence" undermines its specific finding that appellant was guilty beyond a reasonable doubt.[2]

{¶ 77} Second, defendant argues that the panel failed to indicate with sufficient specificity how it determined the weight to be given each mitigating factor and how it balanced those factors against the aggravating circumstances. Pursuant to R.C. 2929.03(F), the trial court was required to state its specific findings as to the existence of any of the statutory mitigating factors as well as any other mitigating factors. This is exactly what the panel did. The panel examined the statutory factors listed in R.C. 2929.04(B), and defendant's history, character, and background. The panel assigned weight to the factors it found present in defendant's case.

{¶ 78} Defendant's complaint is that the panel did not explain how it determined the weight given to the factors considered. However, there is no requirement that the panel explain how it decides how much weight to give to any one factor. The weight, if any, given to a mitigating factor is a matter for the discretion of the individual decisionmaker. *State v. Fox* (1994), 69 Ohio St.3d 183, 193-194, 631 N.E.2d 124, 132; *State v. Mills* (1992), 62 Ohio St.3d 357, 376, 582 N.E.2d 972, 988.

{¶ 79} Finally, defendant argues that the panel incorrectly treated its conclusion that the offense was planned and calculated as a nonstatutory

---

2. The trial court erred in not merging two of the aggravating circumstances (R.C. 2929.04[A][3] and [A][8]); however, the court of appeals merged them in conducting its independent review.

aggravating circumstance. Defendant reaches this conclusion by citing the portion of the opinion in which the panel sets forth the reasons why the aggravating circumstances outweigh the mitigating factors: "The evidence showed that the Defendant's actions were planned and calculated." The panel's conclusion came at the end of a lengthy recitation of the facts of the case. Indeed, the evidence did show that defendant's actions were planned and calculated. But, given the context of the sentence in the whole of the opinion, nothing leads us to believe that the panel weighed this as an additional aggravating circumstance.

{¶ 80} In *Fox*, 69 Ohio St.3d at 192, 631 N.E.2d at 131, this court specifically admonished trial courts to "carefully comply with every specific statutory requirement of R.C. 2929.03(F)." Here, the panel did. Based on all the foregoing, we overrule this proposition of law.

*Scope of Proportionality Review*

{¶ 81} In his ninth, tenth, and eleventh propositions, defendant asks the court to revisit *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus, concerning the universe of cases to be considered by an appellate court when conducting the proportionality review required by R.C. 2929.05(A). Defendant presents no new arguments concerning this issue and, therefore, based upon *Steffen*, these propositions are overruled. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

*Constitutionality of the Death Penalty*

{¶ 82} Defendant argues that Ohio's capital sentencing scheme violates various provisions of the United States and Ohio Constitutions. This court has examined and disposed of these same issues in numerous cases. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Sowell* (1988), 39 Ohio St.3d 322, 336, 530 N.E.2d 1294, 1309; *State v. Steffen*, *supra; State v. Grant* (1993), 67 Ohio St.3d 465, 483, 620 N.E.2d 50, 69; *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph six of the

syllabus; *State v. Lewis* (1993), 67 Ohio St.3d 200, 206, 616 N.E.2d 921, 926; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795; *State v. Phillips* (1995), 74 Ohio St.3d 72, 656 N.E.2d 643; *State v. Coleman* (1989), 45 Ohio St.3d 298, 308, 544 N.E.2d 622, 633; *State v. Smith, supra.* Thus, we overrule defendant's twelfth proposition of law.

## *INDEPENDENT SENTENCE REVIEW*

**{¶ 83}** Defendant was convicted of aggravated murder committed with prior calculation and design. He was also convicted of three separate aggravating circumstances: (1) that the offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by defendant (R.C. 2929.04[A][3]); (2) that the offense was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by defendant (R.C. 2929.04[A][5]); and (3) that the victim of the offense was a witness to prior offenses by defendant and was purposely killed to prevent her testimony in a criminal proceeding concerning those prior offenses (R.C. 2929.04[A][8]). The court of appeals merged the R.C. 2929.04(A)(3) and (A)(8) factors, leaving the 2929.04(A)(5) and (A)(8) factors.

**{¶ 84}** This court, as part of the independent review mandated by R.C. 2929.05(A), must determine whether the evidence supports the trial court's findings of the aggravating circumstances of which the defendant was found guilty. We find that the state clearly met its burden on both aggravating circumstances.

**{¶ 85}** Both the state and federal Constitutions prohibit conviction of any person except upon proof of guilt beyond a reasonable doubt. In examining claims based upon insufficient evidence, a reviewing court will ask whether after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492; *State v. Eley* (1978), 56 Ohio St.2d 169, 10

25

O.O.3d 340, 383 N.E.2d 132. The test is whether there is "substantial evidence upon which a [fact-finder] could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt." *Eley* at syllabus.

{¶ 86} R.C. 2929.04(A)(8) specifically provides that the "victim of the aggravated murder was a witness to an offense *who was purposely killed to prevent the victim's testimony in any criminal proceeding * * * [or] was purposely killed in retaliation for the victim's testimony in any criminal proceeding*." (Emphasis added.)

{¶ 87} While there had been ongoing hostility between defendant and Ms. Filiaggi, defendant did not kill Ms. Filiaggi until she and her fiancé, Eric Beiswenger, filed charges against defendant. Defendant assaulted both of them on December 19, 1993, and Ms. Filiaggi and Beiswenger had audio-recorded the assault. Ms. Filiaggi brought a complaint for domestic violence and Beiswenger brought a complaint for felonious assault. Ms. Filiaggi had witnessed the felonious assault against her fiancé and the domestic violence against her by defendant. A grand jury indicted defendant for both crimes on December 28, 1993. Further, Ms. Filiaggi and Beiswenger brought a complaint against defendant for attempted vandalism, criminal trespassing, and intimidation after an incident on January 20, 1994, when defendant threw a bottle at their living room window. Ms. Filiaggi had also videotaped the defendant throwing the bottle at her house. Similarly, the state could have called Ms. Filiaggi as a witness at defendant's trial on these charges. Two days after the bottle-throwing incident, defendant purchased a semiautomatic pistol. Two days after that, defendant murdered Ms. Filiaggi on January 24, 1994.

{¶ 88} Defense counsel attempted to portray defendant as suicidal, claiming that he did not intend to kill Ms. Filiaggi, but only to take his own life in front of her. We find that defendant's actions belie that theory. On January 24, 1994, defendant took out a $1,000 cash advance on his Visa card. Defendant left $600 or $700 with his girlfriend, Tracey Jones. The record does not show what the

defendant did with the balance of the cash advance. After he murdered his ex-wife, defendant attempted to kill his ex-father-in-law and then fled. Defendant took another $1,000 cash advance on his Visa, switched license plates with a stolen car, rented a car at an airport, and registered at a hotel under a false name. We conclude that this evidenced defendant's plan to flee the jurisdiction after murdering the key witness, Ms. Filiaggi.

{¶ 89} We find that the state presented sufficient evidence to prove that the filing of these complaints was one of the reasons that defendant killed Ms. Filiaggi. The law does not require it to be the sole reason. Despite the long history of hostilities, there was never any physical attempt on Ms. Filiaggi's life until after she brought the charges. In addition, defendant stated twice to Ms. Filiaggi at the time of the shootings that "[t]his will teach you * * * to fuck with me." This evidence, along with the closeness in time to the filing of the complaints, creates a strong inference that supports the state's theory of an attempt to avoid criminal responsibility by killing a witness. In addition, the evidence also supports the theory that defendant killed Ms. Filiaggi *in retaliation* for her testimony in a criminal proceeding, *i.e.*, the bringing of the complaint. Before he murdered Ms. Filiaggi, he told her twice, "This will teach you * * * to fuck with me." Consequently, we find that the state proved this aggravating circumstance beyond a reasonable doubt.

{¶ 90} We now examine the evidence supporting the aggravating circumstance that Ms. Filiaggi's murder was part of a course of conduct. The evidence clearly shows that defendant purposely killed Ms. Filiaggi and then proceeded to the home of Ms. Filiaggi's parents. Ms. Filiaggi's stepfather, Delbert Yepko, answered the door. Defendant asked him if he was ready to die, said, "I'm going to kill you," and then aimed the gun at him. Had Yepko not used the pepper spray against defendant, Yepko would most likely have also been killed. This aggravating circumstance is also supported by sufficient evidence to make

defendant death-eligible.

{¶ 91} Nothing in the nature and circumstances of the offense is mitigating. Defendant was angry at Ms. Filiaggi for the trouble she was allegedly causing him. He perceived that she was antagonizing him, using his children to punish him, and always trying to get more money out of him. Moreover, Ms. Filiaggi had just pressed charges against defendant twice and would likely have been a witness at his trials on these charges. However, Ms. Filiaggi did nothing to provoke defendant at the time of the murder.

{¶ 92} Some mitigating factors are present in defendant's history, character, and background under R.C. 2929.04(B)(7). His mother and sister testified that when his sister was ill as a child, defendant stayed by her side and helped to take care of her. Defendant spent four years in the Army and achieved the rank of sergeant. He saved money while in the Army, went to college on the GI Bill, and graduated *cum laude*. Defendant married Ms. Filiaggi while still in college, and after the children were born, he was described as a loving father to them. Throughout college, defendant supported his family. Defendant maintained fairly steady employment and paid his child support at the time the crime occurred. These factors are entitled to some weight. See, generally, *State v. Reynolds* (1998), 80 Ohio St.3d 670, 686-687, 687 N.E.2d 1358, 1374; *State v. Getsy* (1998), 84 Ohio St.3d 180, 207, 702 N.E.2d 866, 891; *State v. Mitts* (1998), 81 Ohio St.3d 223, 236, 690 N.E.2d 522, 533.

{¶ 93} We must now determine under R.C. 2929.04(B)(3), whether at the time of committing the offense, defendant, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. The defense experts during the trial phase claimed that defendant suffered from bipolar disorder and intermittent explosive disorder. This diagnosis was based on testimony of family members who related incidents in defendant's past concerning his allegedly

uncontrollable temper and his propensity for violence. From the age of five, defendant would act aggressively with very little provocation. When defendant was in the second grade, he hit his teacher. He then began counseling, which continued for a three-year period, with very little improvement. The court heard about other incidents concerning altercations he was involved in throughout the course of his life.

{¶ 94} Defendant's parents testified that he would always express remorse and take responsibility for these rages after they had occurred, but he did not seem able to control himself at the time. His brother indicated that defendant would not incite fights, but it would not take much to get him fighting.

{¶ 95} While the defense witnesses portrayed the defendant's anger problems as uncontrollable, Dr. Phillip Resnick testified that defendant has the ability to control his aggression if it benefits him, or use violence to achieve a purpose. Dr. Resnick explained that defendant engaged in two types of aggression: impulsive aggression and controlled aggression. The impulsive aggression was evidenced by defendant going into a rage and losing control. However, there were numerous examples of defendant's ability to control his aggression. For example, defendant's mother relayed to Dr. Resnick that when defendant was a child, if he wanted the remote control for the TV and one of his sisters would not give it to him, he would punch her and take it. Dr. Resnick explained that this behavior is not rage, but using aggression to accomplish a purpose. Another example of defendant's ability to control his aggression is his history in the military. Dr. Resnick indicated that the defendant told him that because of the consequences, he would walk away from many fights because the military is a more controlled society with regard to consequences. Dr. Resnick testified that defendant behaved similarly while on the job, *i.e.*, did not get into fights, because he knew that there would be serious consequences. Therefore, when defendant was more likely to "get away with it," he was more likely to act on impulse. However, if he was fearful of

facing the consequences, he was able to control his temper.

{¶ 96} As mentioned previously, four experts testified for the defense regarding defendant's mental condition at the time of the crimes. Dr. Pagano diagnosed defendant with bipolar disorder and intermittent explosive disorder. First, Dr. Pagano testified that in the manic phase of bipolar disorder, defendant would be more impulsive and more easily provoked. Again, as mentioned above, Dr. Pagano also testified that he did not read any police reports, and that he relied on the accounts by the defendant, his family, and defense counsel. In addition, he did nothing to verify the accuracy of this information.

{¶ 97} Second, Dr. Bodkin also testified that he believed that defendant suffered from bipolar disorder and intermittent explosive disorder. In addition, Dr. Bodkin believed that defendant suffered from attention deficit disorder. Again, Dr. Bodkin received all of his information used to evaluate defendant from the defendant himself, the defendant's family, and the defense team.

{¶ 98} Third, Dr. Markovitz testified that at the time of the offenses, defendant suffered from bipolar disorder, attention deficit disorder, and intermittent explosive disorder. Dr. Markovitz testified that he did not believe that defendant was aware of or had the ability to reflect on what he was doing at the time he murdered Ms. Filiaggi.

{¶ 99} Finally, Dr. Coccaro also concluded that defendant suffered from intermittent explosive disorder and bipolar disorder. Again, as noted above, Dr. Coccaro testified that he also had done nothing to independently verify the information he reviewed. Instead, he relied on the reports of Drs. Markovitz and Bodkin. Significantly, Dr. Coccaro conceded that it was possible for a person with a history of impulsive aggressive behavior to plan a premeditated, intentional crime that the person knows is wrong.

{¶ 100} Dr. Resnick, the only forensic psychiatrist to testify at the trial, testified on behalf of the prosecution. Based on his interviews, reviews of police

records, witness reports, deputy accounts, and other documents mentioned above, Dr. Resnick made three diagnoses: antisocial personality disorder, alcohol abuse, and attention deficit/hyperactivity disorder of childhood.

{¶ 101} Dr. Resnick disagreed with the conclusion that defendant suffered from intermittent explosive disorder. Instead, Dr. Resnick believed that defendant suffered from antisocial personality disorder. Dr. Resnick explained that there is a specific statement under the criteria for intermittent explosive disorder in the DSM IV manual that says that if the violence can be explained by another disease, such as antisocial personality, then the diagnosis of intermittent explosive disorder may *not* be made. "It's [intermittent explosive disorder] a weaker diagnosis. It's only if someone does not have others, or antisocial personality."

{¶ 102} Dr. Resnick explained to the court that with intermittent explosive disorder, the outbursts are out of proportion to the stimulation. Continual physical fights are much more characteristic of antisocial personality disorder, and not characteristic of intermittent explosive disorder. Because defendant had numerous examples of controlled aggression, he met the category of antisocial personality disorder, rather than intermittent explosive disorder.

{¶ 103} Dr. Resnick arrived at his diagnosis of antisocial personality disorder by evaluating defendant against the criteria in the DSM IV. Dr. Resnick testified that the evidence went beyond that recommended by the manual necessary to make the diagnosis. For example, Dr. Resnick related specific evidence of defendant's antisocial personality. This included defendant's conduct disorder as a child, which was evidenced by his "initiation of physical fights, being physically cruel to people, vandalism, shoplifting, running away from home, truancy, bullying, use of a weapon (knife), and deliberate destruction of property." Further evidence of antisocial personality included defendant's adult unlawful behavior, impulsivity, aggressiveness, indicated by his approximately one hundred physical fights, reckless driving, and lack of remorse, as indicated by rationalizing his behavior and

by his mother saying that he had no remorse after getting into physical fights.

{¶ 104} In addition, Dr. Resnick testified that the defendant's mother told him that several times she heard defendant on the phone with his ex-wife, Ms. Filiaggi, and, one time, after concluding the call, he said, "I'm going to kill her one of these days." Dr. Resnick noted the vengeance of defendant when he said to Ms. Filiaggi before he shot her, "This will teach you * * * to fuck with me." Dr. Resnick stated that it was his belief that this showed that defendant had a rational motive rather than a psychotic motive.

{¶ 105} Dr. Resnick noted that defendant had admitted to Dr. Pagano that while he was feeling suicidal before the act, he thought about taking out others with whom he had grievances and "had done him wrong." That included judges, in an earlier case, and police officers with whom he had trouble in the past. Dr. Resnick noted that on the day of the murder, although defendant had one gun available to him, before leaving for Ms. Filiaggi's home he insisted on taking a second gun with him. Dr. Resnick opined that this did not mesh with the suicide theory.

{¶ 106} Dr. Resnick testified that there was no evidence that defendant was confused or suffering from delusions or hallucinations that suggested to him that killing Ms. Filiaggi was the right thing to do. At the time of the killing, his activities were goal-directed and effective. He parked his car not in front of Ms. Filiaggi's house, but around the corner to keep from being seen. He went to the back door because there was a light by the front door. He chased Ms. Filiaggi into the neighbor's house, suggesting that he was pursuing her, which is goal-directed rather than impulsive behavior. As mentioned above, defendant told the neighbor to stay in the other bedroom and close the door. Again, this demonstrates defendant's ability to control the situation and to control anger.

{¶ 107} Dr. Resnick noted that when defendant drove to his father-in-law's home after shooting Ms. Filiaggi, it showed premeditation, rather than impulsivity, because he actually drove a distance for that purpose. Further, his steps taken after

the murders also suggested that defendant knew he was committing illegal and wrongful acts. Dr. Resnick pointed to the acts of avoiding police, switching license plates with stolen ones, renting a car at an airport, registering in a hotel under a false name, and keeping his calls to his parents' home short because he believed their phone was tapped.

{¶ 108} Dr. Resnick found the defendant to be an above average, intelligent man. He testified that defendant had already spent time in jail for past crimes, knew he was violating a restraining order, lied to obtain a 9 mm gun, and volunteered to Dr. Resnick that he knew right from wrong.

{¶ 109} Defense counsel pressed Dr. Resnick again about the antisocial personality disorder issue. Defense counsel noted that defendant had set and met goals such as graduating from college with honors, marrying, and supporting his family. Defense counsel challenged that these behavior traits are inconsistent with a sociopathic personality. Dr. Resnick disagreed and noted that the fact that a person succeeds does not imply that he or she is not sociopathic. Dr. Resnick continued to disagree with the prior diagnoses of bipolar disorder and intermittent explosive disorder. Dr. Resnick completely disagreed with the defense proposition that if a person suffers from intermittent explosive disorder and bipolar disorder, he or she may not know right from wrong. In fact, Dr. Resnick interviewed defendant, and then after reviewing the medical reports of the defense experts, he went back and systematically asked specific, detailed questions of defendant, his parents, and his girlfriend regarding issues like bipolar disorder, depression, attention deficit disorder, and explored the criteria for those conditions. Dr. Resnick also testified that the diagnostic criteria for attention deficit disorder do not include aggressive violence.

{¶ 110} There was testimony by the defense experts that defendant had a chemical imbalance in his brain. Specifically, some of the defense experts testified that defendant possessed low seratonin levels. Seratonin is a neurotransmitter in

the brain that functions as a behavioral inhibitor. One defense expert testified that if seratonin is low and people have impulsive aggressive problems, it would stand to reason, that if you enhance their seratonin activity, it should make them less impulsive and aggressive. However, Dr. Resnick testified that whether it was impulsive or premeditated, defendant could still know the wrongfulness of his conduct, whatever the diagnosis (bipolar, intermittent explosive, or antisocial personality disorder). In fact, as the court of appeals noted, all of the defense experts conceded that a person with the mental conditions that they identified in defendant could commit a premeditated murder with the knowledge that it was wrong.

{¶ 111} Under R.C. 2929.04(B)(3), defendant was required to prove that "at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law."

{¶ 112} All of the defense experts conceded, as the court of appeals noted, that a person with the mental conditions that they identified in defendant could commit a premeditated murder with the knowledge that it was wrong. In addition, we agree with the court of appeals that the claims that defendant had successfully completed college, served in the military, maintained employment, and cared for his children contradict the claim that he had a mental disease or defect so severe that it rendered him unable to control himself or unable to conform his conduct to the law. Accordingly, we give this factor slight weight under R.C. 2929.04(B)(3).

{¶ 113} Considering the mitigating factors set forth above, we find that the aggravating circumstances outweigh, beyond a reasonable doubt, the factors in mitigation of the death sentence.

{¶ 114} As a part of the appropriateness determination, we must compare this case to other cases reviewed by this court containing the course-of-conduct specification to determine if the death sentence in this case is disproportionate.

**{¶ 115}** In *State v. Allard* (1996), 75 Ohio St.3d 482, 501-502, 663 N.E.2d 1277, 1293-1294, the defendant was convicted of killing his ex-wife and one of his children. Allard presented evidence that he was raised in foster homes and was sexually abused as a child. Allard was remorseful and there was evidence he would adapt well in prison. Like defendant, he also presented evidence that he suffered from bipolar disorder. The court affirmed the death sentence.

**{¶ 116}** In *State v. Awkal* (1996), 76 Ohio St.3d 324, 338-339, 667 N.E.2d 960, 972-973, the defendant killed his wife and brother-in-law. There was mitigating evidence that Awkal was raised in a poor background and did not finish school. Awkal's father was physically abusive. Awkal was gainfully employed, had no prior criminal history, and expressed remorse for the killing. Further, Awkal was suffering from psychological disorders. The court affirmed the death sentence.

**{¶ 117}** In *State v. Sowell*, 39 Ohio St.3d at 336-337, 530 N.E.2d at 1309-1310, the defendant killed one person and attempted to kill a second. Sowell presented mitigating evidence that the killing was the result of provocation and that he was intoxicated when it occurred. The court affirmed the death sentence.

**{¶ 118}** *State v. Claytor* (1991), 61 Ohio St.3d 234, 245-246, 574 N.E.2d 472, 481-482, involved the killing of two hospital guards. Claytor had no criminal convictions. The compelling factor in that case was the existence of the R.C. 2929.04(B)(3) factor, that Claytor, because of a mental disease or defect, lacked the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. The court reversed Claytor's death sentence.

**{¶ 119}** This case is more similar in facts to *Allard*, *Awkal,* and *Sowell*. The mental disorders present in this case are not the severe mental defects found in *Claytor*. As such, we find that the death sentence in this case is not disproportionate when compared to similar cases.

**{¶ 120}** For the reasons stated herein, we affirm defendant's conviction for

aggravated murder and his sentence of death. We also affirm his convictions and sentences for felonious assault and domestic violence in Lorain Common Pleas case No. 93CR044726. However, we reverse the judgment of the trial court in case No. 94CR044866 and the verdicts and/or the sentences imposed for attempted aggravated murder, aggravated burglary, and kidnapping, and remand the cause to the three-judge panel for final resolution consistent with our opinion, *supra*, in defendant's fourth proposition of law.

*Judgment affirmed in part,*

*reversed in part*

*and cause remanded.*

MOYER, C.J., DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur.

PFEIFER, J., concurs in judgment only.

COOK, J., concurs in part and dissents in part.

———————————

**COOK, J., concurring in part and dissenting in part.**

{¶ 121} I concur with the majority opinion, except I would find that any error resulting from a single judge deciding the noncapital offenses in this case was waived by the defendant's failure to object.

{¶ 122} The defendant in a noncapital criminal case where a jury is waived is tried and his guilt determined by a single judge. R.C. 2945.06, in reference to *capital* offenses, provides that where a jury is waived, the case should be tried and determined by a panel of three judges. The statute may *allow* the three-judge panel to determine noncapital offenses along with capital offenses, but does not require it.

{¶ 123} The majority finds, without explanation, that the three-judge panel cannot be waived as to noncapital offenses. I have found no reason why the failure to object should not waive this issue. In fact, our decision in *Swiger v. Seidner* (1996), 74 Ohio St.3d 685, 686, 660 N.E.2d 1214, 1216 (where defendant waived

three-judge panel and a single judge determined both capital and noncapital offenses, single judge had jurisdiction to determine noncapital offense) supports the waiver argument.

{¶ 124} Accordingly, I would affirm the judgment of the court of appeals on this issue.

_____

**APPENDIX**

{¶ 125} "**Proposition of Law One**[:]  It is prejudicial error for a trial court to find a defendant competent to stand trial where the evidence shows that additional evaluations may have shown otherwise.

{¶ 126} "**Proposition of Law Two**[:]  It is an abuse of discretion for a trial court to fail to grant a new trial when that court failed to make a meaningful determination regarding defendant's competence to stand trial.

{¶ 127} "**Proposition of Law Three**[:]  A defendant's decision to waive a jury and be tried by a three judge panel is not voluntary, knowing and intelligent when the court does not engage in any meaningful colloquy with him regarding the meaning of a jury trial.

{¶ 128} "**Proposition of Law Four**[:]  It is a violation of a defendant's due process rights when a trial court fails to have the entire three judge panel decide all the charges contained in the indictment.

{¶ 129} "**Proposition of Law Five**[:]  It is a violation of a defendant's due process rights when the trial court fails to specifically inquire whether defendant knowingly and intelligently waived his right to testify at trial.

{¶ 130} "**Proposition of Law Six**[:]  It is an abuse of discretion and highly prejudicial to a defendant when a trial court refuses to permit a defendant to enter the reports of his experts into evidence.

{¶ 131} "**Proposition of Law Seven**[:]  It is an abuse of discretion for the trial court to refuse to find a defendant not guilty by reason of insanity when the

experts deem otherwise.

{¶ 132} "**Proposition of Law Eight**[:] When the R.C. 2929.03(F) opinion of the three judge panel is defective a new trial must be ordered.

{¶ 133} "**Proposition of Law Nine**[:] It is error for a trial court to impose a death sentence when the death penalty law as currently applied in Ohio violates R.C. 2929.05(A) by requiring appellate courts and the Supreme Court, in conducting their R.C. 2929.04(A) review of 'similar cases' for proportionality, to examine only those cases in which a death sentence was imposed and ignore those in which a sentence of life with parole eligibility after twenty full years or life with a parole eligibility after thirty full years was imposed. The current method also violates the rights to a fair trial and due process, results in cruel and unusual punishment, and implicates others of appellant's protected rights as well, all as set forth in the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and in Sections 1, 2, 5, 9, 10, 16 and 20, Article I of the Ohio Constitution.

{¶ 134} "**Proposition of Law Ten**[:] It is prejudicial error to sentence defendant to the death penalty, when, based upon the law and the record of this case, the sentence of death herein is inappropriate and is disproportionate to the penalty imposed in similar cases, in violation of defendant's rights as guaranteed to him by the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Sections 5, 9, 10 and 16 of Article One of the Ohio Constitution.

{¶ 135} "**Proposition of Law Eleven**[:] The proportionality review that this court must conduct in the present capital case pursuant to Ohio Revised Code Section 2929.05 is fatally flawed and therefore the present death sentence must be vacated pursuant to the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, Sections 5 and 10, Article I of the Ohio Constitution and Ohio Revised Code 2929.05, in violation of defendant's rights as guaranteed to him by the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution and

Sections 5, 9, 10 and 16 of Article One of the Ohio Constitution.

**{¶ 136}** "**Proposition of Law Twelve**[:] R.C. 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05 as read together and as applied in this case violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10, and 16 of Article I of the Ohio Constitution."