DECISION
Defendant-appellant, Robert Beliveau, appeals from a judgment of conviction and sentence imposed by the Franklin County Court of Common Pleas pursuant to a jury verdict finding appellant guilty of one count of rape, a violation of R.C. 2907.02.
Charges against appellant arose out of an incident occurring between appellant and his sometime girlfriend, Kathryn Harris, at her condominium in northwest Columbus on the night of November 6 and 7, 1999. Appellant was initially indicted on one count of rape, one count of kidnapping, and one count of gross sexual imposition. An initial trial led to a hung jury on the rape and kidnapping charges, and an acquittal on the gross sexual imposition charge.
At appellant's retrial on the rape and kidnapping charges, the state presented the testimony of the victim, Kathryn Harris. Harris testified that she had an intermittent relationship with appellant, an over-the-road truck driver, since 1998. In reliance upon the growing relationship, Harris had left her husband in Sacramento, California and moved to Columbus. In the months preceding the alleged attack by appellant, however, the relationship had cooled somewhat, although appellant still had a key to Harris' condominium.
On the day in question, Harris testified, she came home from a bridal shower to find appellant sitting on her couch watching television and masturbating. Appellant demanded sex from Harris, who refused because she had recently had a cervical biopsy and had been told to refrain from intercourse for three weeks. Harris testified that a three-hour argument ensued, punctuated with physical abuse by appellant. During interludes where appellant appeared to be calmed down, Harris changed into her pajamas and prepared to go to bed. She assumed that appellant would be spending the night, but would sleep apart from her.
Appellant renewed his assaults upon Harris and grabbed her when she attempted to leave the residence. Eventually appellant threw her repeatedly against the futon bed and Harris lost consciousness. The last time she noticed the time shown on her clock during these events was approximately 9:00 p.m.
The next morning Harris awoke to find that she was naked, and that appellant was sleeping on the futon next to her. He was also naked. She felt very sore in her genital area, and when she went to the bathroom she discovered the presence of semen in her vagina. While appellant was still sleeping, Harris got dressed and tried to leave, but appellant woke up. Harris then accused appellant of raping her. Appellant denied the allegations, became violent, and threw Harris down on the futon again, pulling out a great deal of hair from her ponytail in the process. Harris testified that appellant pulled down her pants and underwear and attempted to insert his fist in her vagina, shouting that she could not prove that he had raped her. Appellant began choking Harris, who felt appellant was trying to kill her, and she was only able to break free by grabbing his penis and pulling it as hard as she could. Harris was then able to reach the front door and yell for help. Appellant then became frightened, gathered his possessions and left the premises.
Harris called her father, a former deputy sheriff, and he advised her to call the police. While she was waiting for the police to arrive she straightened up the apartment, removing most traces of the struggle. She placed the large clump of hair that appellant had pulled from her head on the coffee table for police to find. When the police arrived, they took her to the hospital where Harris was fitted with a neck brace and given a sexual assault examination.
On cross-examination, Harris testified that she had at the time of the incident been taking valium or xanax for some fifteen years, and vicodain for pain for a similar period. On the day in question, however, she testified, she had not taken any medication because she was planning to drink alcohol at the bridal shower and knew it was dangerous to mix her medication with alcohol. She stated that she had approximately two pi a coladas at the shower. She could not account for her motives in cleaning up the apartment prior to the arrival of police, other than that she did not want to be considered a sloppy or shiftless person.
The prosecution also presented the testimony of Raman Tejwani, who stated that she performed a DNA analysis of appellant's blood sample and of sperm collected during the rape exam of Harris. A DNA match with correlation of one in 1,440 was found.
Dr. Greg Decker of the Riverside Hospital Emergency Medical staff testified that he treated Kathryn Harris as a patient on November 7, 1999. By the time Dr. Decker attended to her, Harris had already been fitted with a "cervical collar" because she complained of pain, and Dr. Decker found areas of tenderness of Harris' jaw and mandible area and her entire neck. The doctor also noted tenderness at the bottom of the lumbar spine, which was confirmed as a fracture of the tailbone by a subsequent X-ray. Dr. Decker did not notice any skull injury, but did state that it was possible for a person to suffer a concussion without any external injury to the scalp or skull itself. Dr. Decker testified that although a concussion of this sort would generally resort in a very short period of unconsciousness of five minutes or less, it was possible for such a patient to go straight from a concussion caused unconscious state to sleep, because of fatigue or alcohol consumption.
Cheryl Rittenour testified as the sexual assault nurse examiner who attended to Kathryn Harris. Nurse Rittenour physically examined Harris and found left head pain, redness on the neck, redness and pain on both the upper inner arms, and some redness and pain in the middle of the back. Nurse Rittenour also noticed mild bruising on the inside of Harris' thighs and some bruising on the lower left leg. A genital exam revealed redness and pain in the vulvar region, and some additional moderate bruising on the inner thighs.
The prosecution also presented the testimony of Columbus Police Detective John Weeks, who interviewed appellant on November 8, 1999, at the time of his arrest. At that time, Detective Weeks stated that appellant denied having any physical contact with Kathryn Harris on the preceding days, and stated that the last time he had seen Harris was November 1, 1999. Appellant told Detective Weeks that it had been over a month since he previously had engaged in sexual intercourse with Harris. Appellant further stated to Detective Weeks that on November 6 and 7, 1999, appellant had been in the Sunbury, Ohio area waiting to pickup a truckload for a transit to Michigan, and that on November 7, 1999, he had in fact traveled to Michigan. Appellant claimed in his interview with Detective Weeks that he possessed receipts that would document his whereabouts on those days. Appellant then refused to allow the detec-tive to examined these travel records.
At the close of the prosecution's case, counsel for appellant made a motion for acquittal pursuant to Crim.R. 29, which was overruled by the trial court. The defense presented no witnesses and rested. Counsel for appellant then used closing argument to point out inconsistencies in Kathryn Harris' testimony, and to state the defense theory that, although appellant now conceded that he had sex with Harris on the night in question, the sex was consensual and Harris, because she was incapacitated by alcohol and her prescription medication, simply could not remember what had happened.
After deliberation, the jury returned a verdict of not guilty on the kidnapping count and guilty on the rape count. The court sentenced appellant to a term of seven years incarceration and found that he should be classified as a sexually oriented offender pursuant to the provisions of R.C. Chapter 2950.
Appellant subsequently filed a motion for a new trial based upon newly discovered evidence and ineffective assistance of trial counsel. The proposed newly discovered evidence consisted of Kathryn Harris' Ameritech phone bill allegedly demonstrating that, at a time significantly later than that at which she claimed to have become unconscious on the night in question, a long telephone call was placed from her number to one of her relatives. The trial court overruled the motion.
Appellant has timely appealed and brings the following assignments of error:
FIRST ASSIGNMENT OF ERROR
 I. DEFENDANT-APPELLANT ROBERT BELIVEAU WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL:
 (1) FAILED TO OBJECT TO THE USE AND ADMISSION OF THE PROSECUTING WITNESS' MEDICAL RECORDS (IDENTIFIED AS STATE'S EXHIBIT J) WHEN THE FINDINGS IN THE MEDICAL RECORDS NOTED THAT THE PROSECUTING WITNESS WAS THE VICTIM OF A `SEXUAL ASSAULT';
 (2) STIPULATED AS TO THE AUTHENTICITY OF THE MEDICAL RECORDS;
 (3) IN CLOSING ARGUMENT, INFORMED THE JURORS THAT THEY WILL DECIDE THE CASE BASED UPON THE CREDIBILITY OF THE PROSECUTING WITNESS * * * AND, ENCOURAGED THE JURORS TO REVIEW THE MEDICAL RECORDS DURING DELIBERATIONS;
 (4) POINTED OUT TO THE JURORS THAT THE DOCTOR'S FINDING IN THE MEDICAL RECORDS IS: CONCUSSION, SEXUAL ASSAULT AND ACUTE NECK SPRAIN;
 (5) TOLD THE JURORS THAT THE DOCTOR IS MAKING A `JUDGMENT' BASED UPON THE `CREDIBILITY OF [THE PROSECUTING WITNESS]' WHEN WRITING DOWN THE PATIENT'S HISTORY;
 (6) FAILED TO INVESTIGATE DEFENDANT-APPELLANT BELIVEAU'S THEORY ON THE PROSECUTING WITNESS' MOTIVE FOR CLAIMING SHE WAS RAPED AND KID-NAPPED; and
 (7) FAILED TO PRESENT AT TRIAL DEFENDANT-APPELLANT BELIVEAU'S THEORY ON THE PRO-SECUTING WITNESS' MOTIVE FOR CLAIMING SHE WAS RAPED AND KIDNAPPED.
 SECOND ASSIGNMENT OF ERROR APPELLANT WAS DENIED HIS DUE PROCESS RIGHT AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTI-TUTION AND BY ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION WHEN LEAD DETECTIVE WOOTEN DESTROYED AND/OR SECRETED THE AUDIOTAPED INTERVIEW OF ALLEGED VICTIM KATHRYN HARRIS.
 THIRD ASSIGNMENT OF ERROR THE TRIAL COURT ABUSED IT'S DISCRETION AND ERRED TO THE PREJUDICE OF APPELLANT BELIVEAU WHEN IT OVERRULED HIS MOTION FOR NEW TRIAL AND THE SUPPLEMENTS TO THE MOTION FOR NEW TRIAL.
Appellant's first assignment of error asserts that appellant was denied his constitutional right to effective assistance of trial counsel. In order to establish a claim of ineffective assistance of trial counsel, a defendant must first demonstrate that his trial counsel's performance was so deficient that it was unreasonable under prevailing professional norms. Strickland v. Washington (1984), 466 U.S. 668, 687-688. A defendant must then establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
 * * * A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." * * * [Id. at 689, quoting Michel v. Louisiana (1955), 350 U.S. 91, 101.]
Among the seven instances of alleged ineffectiveness of trial counsel, the first five concern trial counsel's treatment of the medical records introduced at trial. Appellant asserts that counsel should have objected to the admission of Harris' medical records because they included a "sexual assault" observation among the doctor's findings.
Under the circumstances, we find that trial counsel's actions in stipulating to the medical records were reasonable, because it was an appropriate strategy to allow introduction of the medical records since they offered several favorable inferences for the defense.
First, the medical records generally did not produce evidence consistent with the kind of severe beating described by the victim. On cross-examination, the examining nurse agreed with counsel that the redness and tenderness of the victim's genital area was potentially consistent with unforced sexual intercourse, and not determinative of whether or not the victim had been raped. Dr. Decker's testimony was carefully highlighted by defense counsel to emphasize that although the absence of external skull injury did not preclude a concussion, the mild form of concussion experienced under such circumstances would not have provoked the lengthy period of unconsciousness described by the victim. Since the medical records corroborated the relative lack of externally ascertainable physical injuries suffered by Harris, the records were useful in attempting to impeach Harris' version of events.
Secondly, and most significantly, the "sexual assault" term employed in various points in the medical records, as defense counsel was able to point out, is based solely upon the victim's description of her circumstances to the medical personnel at the hospital. Trial counsel was able to develop and emphasize this distinction, which also played into counsel's strategy of attacking the credibility of Harris' testimony in all its aspects. Trial counsel did not, as appellant now asserts on appeal, defer to the examining medical personnel's notations of "sexual assaults" in the records, but, rather, chose to emphasize this as yet another instance in which the victim's credibility was being brought into play through her accounts given to medical personnel at the hospital.
Given the totality of the circumstances found in the facts of the case and the conditions under which the case was tried, we do not find any deficiency in trial counsel's strategy with regard to admission of the medical records which would meet the first prong of the Strickland test.
Appellant further asserts that trial counsel was ineffective because counsel should have elicited and emphasized evidence which would have established a motive for Harris to bring the rape allegations against appellant to get back at him because he had failed to assist her with her debts and bills, choosing instead to pay his child support obligation. Initially, we note that this "revenge" theory of motivation for the accusations would have been difficult to substantiate without presenting the testimony of appellant himself, which was presumably undesirable because he had prior convictions for attempted rape and assault which might have been raised by the prosecution in an attempt to impeach his credibility. Furthermore, a financially-motivated theory for the victim's accusations is unlikely to have been credible or productive to the defense on the present facts. If the victim's financial dependency upon appellant were argued, her attempts to enforce his financial obligations to her would not have been furthered by the accusations and, in fact, his imprisonment would have cut off any possibility of her receiving the financial assistance she believed herself entitled to. Moreover, such theory would have been incompatible with the defense's ultimate choice of defending on the grounds of consensual sex.
Finally, appellant asserts that trial counsel was ineffective for failing to cross-examine certain witnesses and bring out certain facts. Many of the allegedly deficient aspects of cross-examination appear to have been unproductive or counterproductive, such as further examination of the state's DNA witness, Raman Tejwani: since counsel had adopted a defense of consensual sex, identification through DNA was no longer an issue in the case. Appellant also argues that cross-examination of Detective Weeks would have revealed that appellant did not flee the area after the alleged rape, but was arrested the next day at his usual "hang-out," a twenty-four hour restaurant which he frequented when awaiting trucking assignments. While the failure to flee might have been useful in evincing the lack of consciousness of guilt, there is certainly no evidence that this fact, of itself, would have produced, under Strickland, a different outcome of the case. Firstly, there is no independent evidence in the record that these were, in fact, the circumstances of appellant's arrest; we cannot therefore find that, if questioned, Detective Weeks would have in fact given this response. Secondly, the prosecution made no attempt to create any evidence of consciousness of guilt by asserting that appellant had fled the area. In the context of this case, therefore, we do not find that the failure to illicit this information from Detective Weeks rises to the level of an unprofessional error, and even if we were to so find, its impact upon the case would have been minimal.
In summary, we find that appellant's trial counsel was not ineffective in any of the aspects asserted by appellant. Appellant's first assignment of error is accordingly overruled.
Appellant's second assignment of error asserts that appellant was denied his right to due process because Columbus Police Detective Wooten destroyed or lost an audiotape police interview with Kathryn Harris. It is undisputed that the due process clause protects a criminal defendant from being convicted of a crime where the state fails to preserve materially exculpatory evidence, California v. Trombetta (1984),467 U.S. 479, or destroys in bad faith potentially exculpatory evidence, Arizona v. Youngblood (1988), 488 U.S. 51, 58. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland (1963), 373 U.S. 83, 87.
 * * * Brady, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. * * * [T]he Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. * * * [Youngblood at 57.]
In instances where the evidence destroyed or lost is only potentially exculpatory, Youngblood requires that the defendant prove that the failure to preserve the evidence was done in bad faith. Id; State v. Groce (1991), 72 Ohio App.3d 399, 401; State v. Brust (Mar. 28, 2000), Franklin App. No. 99AP-509, unreported. Furthermore, the defendant must show that, had the evidence been disclosed or furnished to the defense, the result of the proceeding with reasonable probability would have been different. Brust at 5.
In the present case, the allegedly exculpatory evidence at issue was a tape recording of an interview between Detective Wooten and Harris conducted while she was awaiting treatment at Riverside Hospital. Harris testified that she believed a tape recording was made of her interview, but because she was wearing a neck brace she could not depress her vision to ascertain whether a tape machine was actually in use. Detective Wooten testified that he had ascertained that he had not actually made a tape recording, and that he frequently told interviewees that he would make a recording even when he did not. Detective Wooten was certain that he had not actually made a tape of the interview with Harris. Little evidence was produced as to the content of Detective Wooten's interview with Harris, and appellant's brief on appeal does not set forth any specific theory on how the contents of the interview could have in fact been exculpatory for appellant. Under these circumstances, the evidence was not "materially exculpatory" under Trombetta, and appellant would accordingly be required to show bad faith on the part of the state in losing or destroying the tape. Other than attributing a general lack of trustworthiness to the state's police and prosecutorial personnel, appellant's brief does not set forth such a showing of bad faith. We accordingly find that appellant has failed to support his burden on appeal of showing bad faith with respect to the loss of the putative tape recording of Harris and the exculpatory nature of the material that might be contained therein. Appellant's second assignment of error is accordingly overruled.
Appellant's third assignment of error asserts that the trial court abused its discretion by overruling appellant's motion for a new trial. As stated above, the motion for new trial was based both upon appellant's allegations that his trial counsel was not working on his behalf, and the newly discovered evidence in the form of Kathryn Harris' phone bill. The allegations with respect to appellant's counsel are sufficiently addressed in our discussion of appellant's first assignment of error. With respect to the phone bill, allegedly showing a lengthy phone call made from Harris' residence to one of her relatives some time after the point in the evening when she believed that she had been rendered unconscious by appellant, we find that the trial court did not err in concluding that this was not a basis for a new trial. When reviewing upon appeal a judgment denying a defendant's motion for new trial, this court will apply the standard of abuse of discretion. State v. Filiaggi (1999), 86 Ohio St.3d 230, 237; State v. Williams (1975), 43 Ohio St.2d 88. The term "abuse of discretion" connotes more than a mere error of law or judgment; it implies an attitude that is arbitrary, unconscionable, or unreasonable. State v. Adams (1980), 62 Ohio St.2d 151, 157.
 To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence. * * *
State v. Petro (1947), 148 Ohio St. 505, syllabus. Examining only the first Petro factor, we find that the phone bills sought to be admitted would not have raised a strong probability that the outcome would have been different if a new trial were granted. Harris testified at length regarding the lengthy period of verbal and physical abuse administered by appellant prior to her losing consciousness. Her testimony was not exact on the time at which she in fact lost consciousness; Harris testified only that the last time she "noticed the time" was at 9:00 p.m. Her phone bill does disclose a lengthy call some one and one-half hours later than this to a number in Johnstown, Ohio, to which numerous other phone calls were placed during the month. However, nothing in the record can lead us to ascertain that Harris herself placed this phone call, nor can we conclude that, in light of Harris' vague appreciation of the time in question, the phone call would have conclusively undermined her credibility with the jury. The time frame surrounding the attacks, as recounted by Harris, is vague. The chronological exactitude of her account was not, moreover, essential to prove or disprove the acts alleged. Defense counsel at trial made diligent efforts to demonstrate the inaccuracies and inconsistencies in Harris' testimony, presumably with some success since appellant was acquitted at his first trial of the gross sexual imposition charge and at his second trial of the kidnapping charge. Because the outcome of the trial would not in all likelihood have been different, we find that the trial court did not abuse its discretion in denying appellant's motion for a new trial based upon the newly discovered evidence in the form of the victim's phone bills. Appellant's third assignment of error is accordingly overruled.
Based upon the foregoing, appellant's first, second, and third assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
LAZARUS and KENNEDY, JJ., concur.