[Cite as *State v. Socie*, 2022-Ohio-2526.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                    Court of Appeals No.  WD-21-039

            Appellee                             Trial Court No.  2020CR0167

v.

Chelsea Joy Socie                                **DECISION AND JUDGMENT**

            Appellant                            Decided:  July 22, 2022

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**ZMUDA, J.**

## I.  Introduction

{¶ 1} Appellant, Chelsea Socie, appeals the judgment of the Wood County Court

of Common Pleas, imposing an indefinite prison sentence of three to four and one-half

years after a jury found appellant guilty of one count of involuntary manslaughter and

one count of trafficking in a fentanyl-related compound. Finding no error in the proceedings below, we affirm.

## A. Facts and Procedural Background

{¶ 2} On April 30, 2020, appellant was indicted on one count of involuntary manslaughter in violation of R.C. 2903.04(A) and (C), a felony of the first degree, and one count of corrupting another with drugs in violation of R.C. 2925.02(A)(3) and (C)(1), a felony of the second degree. The state subsequently moved to amend the indictment on March 8, 2021. The trial court permitted the amendment, preserving the charge of involuntary manslaughter but changing the corrupting charge to one count of trafficking in a fentanyl-related compound in violation of R.C. 2925.03(A)(1) and (C)(9)(a), a felony of the fifth degree.

{¶ 3} The charges contained in the amended indictment relate to an incident that occurred on August 29, 2019, in which Teresa Long died of an overdose of fentanyl allegedly supplied by appellant. The specific facts of the incident were established at a two-day jury trial that began on March 31, 2021, after appellant pled not guilty and the parties conducted pretrial discovery. These facts were as follows.

{¶ 4} According to data extracted from Long's mobile phone, appellant and Long's son, Kyle Lohmeyer, were engaged in text message discussions with Long about providing her with drugs on the evening of August 28, 2019. Lohmeyer's text message conversation with Long was limited to the afternoon and early evening of August 28, 2019. During the text message conversation, Lohmeyer offered to bring appellant "a big"

2.

in exchange for $20. At trial, Perrysburg Township Police Department detective Dustin Glass stated that the term "big" is a reference to a certain weight of narcotics. Long agreed to Lohmeyer's offer, responding: "I can give you 20 for a big." However, Lohmeyer was unable to go to Long's residence on the evening of August 28, 2019, because he was "still towing cars."

{¶ 5} Shortly after Lohmeyer informed Long that he would not be coming to Long's residence, appellant received a text message from Long informing appellant that Long's fiancé, John Fels, was home. In an apparent attempt to prevent Fels from discovering her drug usage, Long instructed appellant to "put it in the door of the van." Appellant replied: "I am not coming there if [you] have company ding dong. If he is going to be there for a little bit Kyle will just have to come with me and go in and put it in [your] bathroom or something." Long then offered to retrieve the delivery from her mailbox. Appellant responded that such an idea "might be easier [because] I don't think Kyle wants to go." She further instructed Long to meet her at the mail box and informed Long that she would "head that way in a little bit." Appellant's final text message to Long on August 28, 2019, informed Long that she was on her way.

{¶ 6} On the morning of August 29, 2019, Fels left for work at 7am. Long was still asleep in bed when he departed. A couple hours later, appellant sent text messages to Long informing Long that she was on her way and asking Long if she had any soda. There is nothing in the evidence produced by the state to establish any communication between appellant and Long prior to appellant's text message that she was on her way.

3.

Appellant testified that she had two phone conversations with Long earlier in the morning, but the evidence in the record contradicts that claim, as we note in our analysis below.

{¶ 7} A criminal intelligence analyst for the Ohio Bureau of Criminal Investigation, Lori Braunschweiger, testified at trial as to her analysis of mobile phone records and cell tower data associated with appellant's phone number, which revealed that appellant sent Long two text messages between 9:11 a.m. and 9:21 a.m. Long quickly responded to each message. At the time, appellant was in the approximate location of her own residence.

{¶ 8} Based upon the cell tower data she received from Sprint, Braunschweiger determined that appellant departed her own residence and traveled to an area encompassing the Friendly Village mobile home park where Long lived at approximately 9:30 a.m. Thereafter, appellant traveled to East Toledo and returned to the area around Long's residence at approximately 10:38 a.m. From there, appellant traveled back to the area near her residence at 10:49 a.m. Also at 10:49 a.m., appellant received a call from Long, with whom she spoke for one minute and 23 seconds.

{¶ 9} At approximately 11:30 a.m., Fels spoke with Long on the telephone for 15 minutes. During the call, Long told Fels that her day was going well. Fels did not ask Long whether she had left her mobile home at all that morning. After getting off work at 1 p.m., Fels went to a doctor's appointment. While on his way to the doctor, Fels called Long several times but received no answer.

4.

{¶ 10} Meanwhile, appellant sent a text message to Long at 12:55 p.m. Receiving no response, appellant called Long at 2:02 p.m. That call lasted only 37 seconds, and appellant followed up with another text message to Long less than one minute later. Appellant sent one final text message to Long at 2:54 p.m.

{¶ 11} After his doctor's appointment, Fels went directly home. Upon arrival, Fels found Long unresponsive on the bathroom floor. He immediately called 911 and began to provide CPR as instructed by the dispatcher while he waited for emergency personnel to arrive. Fels was reportedly unaware of Long's use of fentanyl, although he had recently noticed some concerning discrepancies in his personal finances, which he shared with Long.

{¶ 12} Christopher Klewer, a patrol officer for the Perrysburg Township police department, was on duty on August 29, 2019, when he and another officer, Alicia Cryan, responded to a call from dispatch alerting them to a possible overdose at lot 98 of the Friendly Village mobile home park in Perrysburg Township.

{¶ 13} When the officers arrived on the scene, Fels directed them inside the residence. Upon entering, the officers found Long lying on the bathroom floor. According to Klewer, Long's body was limp and her face was a "bluish, purplish color." Fearing an overdose, Cryan administered Narcan to Long in Klewer's presence. Long did not respond to the treatment. Shortly thereafter, paramedics arrived and took over the resuscitation efforts.

5.

{¶ 14} Klewer stated that he observed no signs of foul play around the area where Long's body was found. However, he noticed that drug paraphernalia including a spoon, syringe, and cotton swab was sitting on the vanity in the bathroom. Further, he found a pill bottle containing gabapentin in Long's dresser drawer. The pills were prescribed to Long.

{¶ 15} Pictures of the paraphernalia were authenticated by Klewer and admitted into the record at trial. Klewer explained that the syringe is used to administer the fentanyl into the human body, the spoon is used to cook the drugs, and the cotton swab is used to place the drugs into the syringe. In sum, Klewer testified that these materials are "commonly used for intravenous drug use." Because he suspected a drug overdose, Klewer summoned detective Glass, who was on-call at the time.

{¶ 16} When he arrived on scene, Glass searched Long's residence and observed the drug paraphernalia from Long's bathroom. Glass secured the drug paraphernalia and retrieved Long's mobile phone. Thereafter, Glass extracted all of the data from Long's mobile phone, which revealed communications with appellant and Lohmeyer in the hours leading up to Long's death. Based upon these findings, Glass secured a search warrant for the mobile phone records associated with phone numbers registered to appellant and Lohmeyer.

{¶ 17} After evaluating the evidence recovered from Long's residence, Glass decided to call appellant to ask her some questions. During the phone call, which was recorded and admitted into evidence at trial, appellant insisted that she was helping

6.

Lohmeyer tow vehicles on August 29, 2019, and had nothing to do with Long's death. At trial, Glass testified that the statements appellant made during the phone call were inconsistent with her phone records. While speaking with Glass on the phone, appellant agreed to an in-person meeting. Glass testified that appellant never appeared for the meeting and provided no further cooperation.

{¶ 18} At trial, Glass testified as to the significance of the phone calls appellant received, but did not answer, prior to leaving for Long's residence on August 29, 2019. The calls were made by a number registered to Jimmie Jordan, an East Toledo resident whom Glass characterized as someone with "a very extensive history of drug trafficking." Further, Glass reviewed the cell tower data compiled by Braunschweiger and noted that appellant traveled to the area encompassing Jordan's residence between 9:30 a.m. and 10:38 a.m. on the morning of August 29, 2019.

{¶ 19} In order to establish Long's cause of death, the state called Dr. Robert Forney, who works as a toxicologist for the Lucas County coroner's office. Forney performed toxicology tests on Long and prepared a report summarizing his findings. The report was admitted into the record without objection. The results of the tests revealed high concentrations of fentanyl and acetyl fentanyl, which Forney described as a highly toxic analog of fentanyl. The toxicology tests administered by Forney also revealed the presence of amitriptyline (an antidepressant), diphenhydramine (an antihistamine, commonly known under the brand name Benadryl), gabapentin (a pain medication),

7.

naloxone (an opioid antagonist commonly known as Narcan), norfentanyl (a metabolite of fentanyl), and nortriptyline (a metabolite of amitriptyline).

{¶ 20} Comparing the concentration of norfentanyl (1.8 nanograms per milliliter) to the concentration of fentanyl (7.2 nangrams per milliliter) discovered in Long's bloodstream, Forney was able to ascertain that the fentanyl was administered less than an hour before Long's death. He explained that upon administration of fentanyl, the substance

> starts breaking down and as it breaks down the norfentanyl goes up. * * *
> But when we find must less norfentanyl to the fentanyl, there is no scenario
> other than the fentanyl had been administered shortly before she died.
> Norfentanly could have been from the previous administration. But there
> just wasn't enough time for the 7.2 to create more of the metabolite.

{¶ 21} Based upon the results of the toxicology tests as well as the existence of a "fresh needle track" on Long's left arm, Forney concluded that Long died from "combined drug toxicity." This conclusion was buttressed when Forney tested the spoon and cotton swab for drug residue and found traces of, among other things, fentanyl and acetyl fentanyl. On cross examination, Forney elaborated as to the cause of death, stating: "but for the fentanyl, acetyl fentanyl, [Long] would not have died."

{¶ 22} At the conclusion of the state's presentation of the foregoing evidence, appellant's trial counsel moved for an acquittal under Crim.R. 29, arguing that the state failed to present any evidence to establish that appellant sold fentanyl to Long on August

8.

29, 2019. The state responded that it had introduced such evidence in the form of the text message conversations between appellant and Long that included cryptic language suggestive of drug activity on the eve of Long's death. Upon consideration of the parties' arguments, the trial court denied appellant's Crim.R. 29 motion, and the matter proceeded to appellant's case-in-chief, during which appellant was the only witness.

{¶ 23} At the outset of appellant's testimony, she stated that she was in daily contact with Long in the months leading up to Long's death. Appellant testified that she and Long "were both doing things that we were hiding from John [Fels]," namely using heroin together.

{¶ 24} According to appellant, Long began contacting her on August 28, 2019, and asking her to bring her drugs. Later that evening, appellant met Long at the opposite end of the mobile home park and provided her with "$20 of heroin" that was previously purchased by Lohmeyer. Long asked appellant to meet her in this surreptitious manner to avoid detection by her family members who were gathered at her residence for a birthday party. Long did not pay her for the heroin.

{¶ 25} Appellant testified that Long contacted her on Lohmeyer's phone on the morning of August 29, 2019, and asked appellant to take her to purchase heroin. Appellant testified as to the content of these conversations, stating that Long offered to purchase heroin for herself and appellant if appellant would transport her. Appellant agreed, departed for Long's residence, and sent Long a text message informing Long that she was on the way.

9.

{¶ 26} Notably, appellant's testimony is contradicted by the cell phone records introduced into by the state. These records establish that appellant sent Long a text message telling Long that she was on her way at 9:11 a.m. Records associated with Lohmeyer's mobile phone reveal that Lohmeyer received two calls from Long on the morning of August 29, 2019, one at 9:55 a.m. and one at 10:06 a.m. Thus, it appears that appellant did not speak to Long on Lohmeyer's phone prior to driving to Long's residence on the morning of August 29, 2019.

{¶ 27} Appellant indicated that she arrived at Long's residence at approximately 9:30 a.m. Upon arrival, appellant helped Long get into her Dodge Avenger and placed Long's wheelchair in the rear seat of the vehicle. She claimed the two left Long's residence and traveled to Huntington Bank, where Long withdrew cash from an ATM machine. Thereafter, appellant took Long to Burger King in East Toledo and parked her vehicle.

{¶ 28} Appellant testified that when the drug dealer arrived, he "pulled up next to us, got out [of] the car, and made the transaction through the passenger's side window." Appellant insisted that she had no part in the transaction. Rather, appellant explained that Long "held her money and [the dealer came] up to the window and gave her what she wanted and then she gave me my portion and we drove back to her house." Appellant stated that she and Long arrived back at Long's residence at approximately 10:15 a.m. Appellant helped Long out of the vehicle and into her wheelchair, and bid her goodbye. At 10:49 a.m., appellant received a phone call from Long, who indicated to appellant that

10.

she was doing fine and had used the recently purchased heroin. That was the last time appellant spoke to Long.

{¶ 29} At the conclusion of her testimony, appellant rested. She then renewed her Crim.R. 29 motion for acquittal, which was summarily denied by the trial court. Immediately thereafter, the state requested a jury instruction on complicity as to both offenses contained in the indictment, arguing that appellant's testimony that she transported Long to the drug dealer implicated her as an accomplice. Specifically, the state posited:

> I think to be most clear, the act itself is sell or offer to sell a Fentanyl-
> related compound. Someone sold a Fentanyl-related compound. Ms.
> Socie, by her own admission, was complicit in that in the sense that in order
> to sell someone a Fentanyl-related compound, you need to send someone to
> sell it to. In this case, she provided that someone. She provided Teresa
> Long by giving her transportation to that address. And but for her
> complicity in that act, it would not have been successful.

{¶ 30} Upon consideration of the state's request, the trial court determined that there was no evidence that appellant shared the drug dealer's criminal intent. Consequently, the trial court denied the request, and the matter proceeded to jury instructions and closing arguments.

{¶ 31} During its closing argument, the state urged the jury to find that appellant sold a fentanyl-related compound to Long on August 29, 2019, as follows:

11.

Clearly, there was a sale at this point in time. I think if you look at it, there was a sale at some point because there was a conversation on the phone or the text message that [Long] wanted to buy fentanyl on that particular day. We know that she had fentanyl in her system that caused her death. So there had to be a sale at some point in time. They talk about the sale could be either transferred or a gift or just some transaction that actually created that aspect of it. And if you go on – in fact, the statement of the defendant is that she's the one who actually participated in this sale. She's the one who drove her up to Toledo. She's saying that she was the only one who participated in it. It couldn't have occurred without the actual acts of the defendant to help create or have the sale occur in regards to that. It wouldn't have occurred if she hadn't driven her up there. So she participated in that aspect of it. She was complicit. She aided and abetted in the actual sale. And it would not have occurred but for the fact that – according to her own testimony – that she drove her up to help complete the sale and actually participated. She actually got some of the drugs in regards to that. That's why she did that. But there was a sale of a fentanyl-related compound.

{¶ 32} Appellant's trial counsel did not object to the state's reference to complicity in its closing argument despite the trial court's rejection of the state's request for a complicity instruction. Instead, appellant's trial counsel asserted in her closing

argument that she did not sell a fentanyl-related compound to Long on August 29, 2019. On the contrary, appellant argued that she merely transported Long to the point of sale, where Long purchased the drugs for herself and appellant. As to the state's complicity argument, appellant contended that she "didn't set up this deal. She didn't sell the drugs to Ms. Long. She drove an individual who was a substance abuser to make a transaction for drugs. How could you argue that she was assisting the drug dealer who, although she did say she knew him, she didn't set up the transaction?"

{¶ 33} Following closing arguments, the jury retired to deliberate. Ultimately, the jury found appellant guilty of both counts contained in the indictment.

{¶ 34} On April 15, 2021, appellant appeared for a sentencing hearing, at which the trial court ordered her to serve an indefinite sentence of three to four and one-half years in prison for involuntary manslaughter and one year for trafficking in a fentanyl-related compound. The court ordered the sentences to be served concurrently. Thereafter, appellant filed her timely notice of appeal.

### B. Assignments of Error

{¶ 35} On appeal, appellant assigns the following errors for our review:

I. Indefinite sentencing under the Reagan Tokes Act is unconstitutional under the Fourteenth Amendment of the United States Constitution and the applicable sections of the Ohio Constitution.

13.

II. Appellant received ineffective assistance of counsel in violation of her rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, § 10 of the Ohio Constitution.

III. The trial court erred to the prejudice of Appellant by denying her Crim.R. 29 motion.

IV. The jury's verdict was against the manifest weight of the evidence presented at trial.

{¶ 36} For ease of discussion, we will address appellant's assignments of error out of order.

## II.     Analysis

### A.     Sufficiency of the Evidence

{¶ 37} In her third assignment of error, appellant argues that the trial court erred in denying her Crim.R. 29 motion for acquittal, because the state failed to introduce sufficient evidence to support convictions for trafficking in a fentanyl-related compound and involuntary manslaughter.

{¶ 38} We review a disputed denial of a Crim.R. 29 motion for acquittal under the same standard used to determine whether a verdict is supported by sufficient evidence. *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.  In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v.*

14.

*Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. The inferences reasonably drawn from the state's evidence, like the evidence itself, are to be viewed in a light most favorable to the state. *State v. Filiaggi*, 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999).

{¶ 39} Here, appellant was convicted of trafficking in a fentanyl-related compound and involuntary manslaughter. There is no dispute that the trafficking offense is the predicate offense used by the state to secure appellant's conviction for involuntary manslaughter. Thus, we will begin our analysis with a consideration of the elements of the trafficking offense under R.C. 2925.03(A)(1), which provides in pertinent part:

(A) No person shall knowingly do any of the following:

(1) Sell or offer to sell a controlled substance or a controlled substance analog.

{¶ 40} Appellant does not dispute that Long died as the result of ingesting a controlled substance or controlled substance analog, namely a fentanyl-related compound. However, appellant contends that "there was no evidence that [she] sold or offered to sell drugs to [Long] on [August] 29, 2019." According to appellant, the evidence introduced at trial established that she merely provided transportation to Long on the day of Long's overdose, but did not sell any drugs to Long. Citing our decision in *State v. Haynes*, 2020-Ohio-1049, 152 N.E.3d 1217 (6th Dist.), appellant argues that mere transportation is insufficient to satisfy the sale element in R.C. 2925.03(A)(1).

15.

{¶ 41} In response, the state argues that the evidence it introduced at trial was sufficient to meet the definition of a "sale" set forth in R.C. 3719.01(U) and incorporated into the trafficking statute under R.C. 2925.01(A).

{¶ 42} Under R.C. 3719.01(U), a sale "includes delivery, barter, exchange, transfer, or gift, or offer thereof, and each transaction of those natures made by any person, whether as principal, proprietor, agent, servant, or employee." Emphasizing the breadth of this definition, the state contends that it introduced sufficient evidence to show that appellant sold Long the fatal dose of fentanyl on August 29, 2019. Specifically, the state points to the evidence establishing appellant's history of providing drugs to Long, especially on August 28, 2019, as well as evidence of appellant's communications with Long on the day of Long's overdose and the cell tower location data placing appellant in the area of Long's residence and near the area known to be frequented by Jordan for the purpose of selling drugs.

{¶ 43} We agree with the state that the definition of "sale" in the Ohio Revised Code is very broad. Of particular note in this case is the General Assembly's decision to include transfers of drugs within that definition. Reviewing the state's evidence in a light most favorable to the state, we find that a rational fact finder could find that appellant transferred the fatal dose of fentanyl to Long on the morning of August 29, 2019, thereby satisfying the sale element of 2925.03(A)(1).

{¶ 44} Specifically, the text messages sent among appellant, Lohmeyer, and Long on August 28, 2019, establish that appellant took narcotics ("a big") to Long on that

16.

evening.  Further, the phone records and cell tower data introduced by the state reveal that appellant interacted with Long in the hours leading up to the overdose and traveled to East Toledo to an area frequented by Jordan, who called her three times that morning prior to her arrival.  The cell tower records show that appellant arrived at Long's residence sometime after 9:22 a.m. on the morning of August 29, 2019.  Appellant then departed from Long's residence and traveled north toward East Toledo, arriving in the area of the alleged drug transaction at approximately 9:42 a.m.  Cell tower records are inconclusive as to how long appellant remained in East Toledo, but she was back in the area of Long's residence by 10:38 a.m.  By 10:51 a.m., appellant had returned to her residence.[1]

{¶ 45} While the foregoing evidence does not *directly* prove appellant's sale of fentanyl to Long on August 29, 2019, the state's circumstantial evidence and the reasonable inference to be drawn therefrom, viewed in a light most favorable to the state, could lead a factfinder to conclude that appellant transferred fentanyl to Long on the morning of August 29, 2019.  From the evidence, one could infer that appellant went to Toledo by herself to purchase fentanyl from Jordan on appellant's behalf, delivered the fentanyl to Long at Long's mobile home, and then returned to her residence.  The

---

[1] Cell tower location data associated with Long's phone number was not examined by the state or any of its witnesses.  The state provided no explanation for its decision not to retrieve such cell tower location data, which may or may not have definitively ruled out appellant's contention that she transported Long to the location of the drug purchase rather than buying the drugs herself.

17.

inference that appellant traveled alone is supported by Fels' testimony that Long does not ordinarily leave her residence because she is in a wheelchair and has a difficult time getting around. Moreover, it would be consistent with appellant's delivery of drugs to Long just one day prior.

{¶ 46} In light of the foregoing, we find that appellant's conviction for trafficking in a fentanyl-related compound is supported by sufficient evidence. As there is no dispute that Long died as a consequence of ingesting the fentanyl she received on August 29, 2019, we also find that the state proved involuntary manslaughter with sufficient evidence. Accordingly, appellant's third assignment of error is not well-taken.

## B.     Manifest Weight of the Evidence

{¶ 47} In her fourth assignment of error, appellant argues that her convictions were against the manifest weight of the evidence.

{¶ 48} When reviewing a manifest weight claim, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). That is, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. *Id.* Our role is to determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* We reverse a conviction on manifest weight grounds for only the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.* at 387.

18.

{¶ 49} Here, appellant asserts that the jury clearly lost its way when it found her guilty of trafficking in a fentanyl-related compound and involuntary manslaughter in light of her testimony that she merely transported Long from her residence to the location of the drug deal and back home.

{¶ 50} As we already noted, the evidence presented by the state in this case, while mostly circumstantial, permits a rational trier of fact to find appellant guilty of trafficking and involuntary manslaughter. Nonetheless, appellant argues that the jury did not consider the totality of the evidence in this case, including appellant's testimony that her "role was limited on August 29, 2019 to driving [Long] so that she could purchase her own drugs."

{¶ 51} At its core, this case comes down to whether the jury believed appellant's version of the events that transpired on the morning of August 29, 2019, or not. Based upon its verdict, the jury clearly did not find appellant's story credible. Upon review, we find that appellant's testimony was inconsistent with the evidence in two respects.

{¶ 52} First, appellant was dishonest during her phone interview with detective Glass concerning her whereabouts on August 29, 2019. During the recorded phone call, appellant insisted that she was helping Lohmeyer tow vehicles on August 29, 2019, a statement that is plainly at odds with appellant's trial testimony as well as the phone records and cell tower data associated with appellant's phone.

{¶ 53} Second, appellant's testimony regarding the sequence of events that transpired on August 29, 2019, does not square with the phone records and cell tower

19.

data introduced by the state. Indeed, appellant testified at trial that Long initiated contact with her on August 29, as follows:

> She called Kyle's phone about three or four times, like at 8:45ish, 8:50. * * * And she said, "I will buy you this if you take me," you know, "if you take me to get the stuff, I'll buy it. You can just pay me back later," * * *. We had that conversation on the phone. I then paid the three dollars to turn my phone back on – something along those lines – because I was paying a daily boost thing and I texted her, "I'm on my way."

{¶ 54} Contrary to this testimony, Lohmeyer's phone records show that the phone calls he received from Long were placed at 9:55 a.m. and 10:06 a.m., not at 8:45 a.m. Appellant acknowledged at trial that she arrived at Long's house at "probably maybe 9:30ish, 9:40ish," and cell tower location data confirms that appellant and Lohmeyer were in different locations at 9:55 a.m. At that time, appellant was already in Toledo and Lohmeyer was still at home.

{¶ 55} While the foregoing inconsistencies in appellant's testimony do not render impossible appellant's version of the events, they do cast doubt on appellant's credibility. As already noted, appellant's manifest weight argument is entirely dependent upon the credibility of her testimony, especially since appellant presented no other evidence to corroborate her testimony or to contradict the state's evidence.

{¶ 56} Therefore, on the record before us, we cannot say that the evidence weighs heavily against the conviction and that this is the exceptional case in which the conviction

20.

is against the manifest weight of the evidence. Accordingly, appellant's fourth assignment of error is not well-taken.

### C. Constitutionality of the Reagan Tokes Law

{¶ 57} In her first assignment of error, appellant argues that the indefinite sentencing scheme set forth in R.C. 2967.271 (the "Reagan Tokes Law") is facially unconstitutional because it vests power in the executive branch to determine whether she has violated the law, thereby infringing upon the exclusive power of the judicial branch and violating the separation-of-powers doctrine. Relatedly, appellant argues in her second assignment of error that her counsel was ineffective for failing to raise this constitutional challenge in the trial court.

{¶ 58} Constitutional challenges to the Reagan Tokes Law have been raised in this court many times. In *State v. Gifford*, 6th Dist. Lucas No. L-21-1201, 2022-Ohio-1620, we found that the Reagan Tokes Law does not violate the separation-of-powers doctrine. Then, in *State v. Stenson*, 2022-Ohio-2072, --- N.E.3d ---- (6th Dist.), we found that the Reagan Tokes Law does not, on its face, infringe upon a defendant's right to due process. Most recently, in *State v. Eaton*, 6th Dist. Lucas No. L-21-1121, we reiterated our prior determinations as to the constitutionality of the Reagan Tokes Law upon a thorough analysis of arguments identical to those raised by appellant in this case.

{¶ 59} Since appellant raises no new arguments here, we find, consistent with our prior determinations in *Gifford*, *Stenson*, and *Eaton*, that appellant's separation-of-powers and due process arguments are without merit. By extension, we find that appellant's trial

21.

counsel was not ineffective for failing to challenge the constitutionality of the Reagan Tokes Law in the trial court.

{¶ 60} Accordingly, appellant's first and second assignments of error are not well-taken.

### III.    Conclusion

{¶ 61} In light of the foregoing, the judgment of the Wood County Court of Common Pleas is affirmed.  The costs of this appeal are assessed to appellant under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.

_____
JUDGE

Myron C. Duhart, P.J.
CONCUR.

_____
JUDGE

Christine E. Mayle, J.
CONCURS AND WRITES
SEPARATELY.

_____
JUDGE

22.

**MAYLE, J.**

{¶ 62} I concur in the majority judgment, however, I write separately to clarify one point made by the majority in its disposition of Socie's first assignment of error.

{¶ 63} I agree that in *State v. Gifford*, 6th Dist. Lucas No. L-21-1201, 2022-Ohio-1620, we found that the Reagan Tokes Law does not violate the separation-of-powers doctrine. And I agree that in *State v. Stenson*, 2022-Ohio-2072, --- N.E.3d ---- (6th Dist.), we found that the Reagan Tokes Law does not, on its face, infringe upon a defendant's right to due process. But with respect to the majority's citation to *State v. Eaton*, 6th Dist. Lucas No. L-21-1121, 2022-Ohio-2432, it should be noted that there was a lead decision (analogizing additional term hearings to parole/probation *release* decisions and finding that the procedural safeguards afforded defendants under the Reagan Tokes Law are sufficient to pass constitutional muster) and a concurring decision (analogizing additional term hearings to parole/probation *revocation* decisions and finding that while failing to set forth adequate process in the statute itself, the Reagan Tokes Law is nevertheless capable of being enforced in a manner consistent with the process due an offender). It is for the reasons detailed in the concurring decision that I believe Socie's first assignment of error should be found not well-taken.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.