[Cite as *State v. Catale*, 2025-Ohio-3174.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

AMBER L. CATALE,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 25 MA 0023**

---

Criminal Appeal from the
Campbell Municipal Court of Mahoning County, Ohio
Case No. CRB 2400069B

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Lamprini G. Mathews,* City of Campbell Law Department, for Plaintiff-Appellee and

*Atty. Gregg A. Rossi*, Rossi & Rossi Co., for Defendant-Appellant.


Dated:  September 3, 2025

**Robb, P.J.**

{¶1} Defendant-Appellant Amber L. Catale appeals the judgment of the Campbell Municipal Court finding her guilty of violating a city ordinance prohibiting misuse of the 911 system. She challenges the sufficiency of the evidence and the weight of the evidence. For the following reasons, the trial court's judgment is affirmed.

<u>STATEMENT OF THE CASE</u>

{¶2} On March 12, 2024, Appellant was arrested for misuse of the 911 system, a fourth-degree misdemeanor under Campbell City Code 537.12. Due to her conduct during that arrest, she was also charged with resisting arrest, a second-degree misdemeanor under R.C. 2921.33(A). (3/13/24 Complaint). The case was tried to the bench on January 24, 2025.

{¶3} The Campbell Police Department's dispatcher testified to receiving a 911 call wherein Appellant reported she was threatened by a person at a specified address on Tenney Avenue in Campbell. The dispatcher testified she takes a caller's explanation at face value, pointing out, "911 is all emergency. You call 911, it's an emergency to me." (Tr. 19-20). Although the call was transferred from the primary 911 line to her at the secondary (local) 911 line, the testifying dispatcher explained each call begins with a prerecorded question asking the caller about "the emergency." (Tr. 20-21).

{¶4} The 911 call was played for the court. (St. Ex. 1). When asked what was going on at the specified address on Tenney Avenue, Appellant said a man named John "threatened" her by saying, "I don't know what he will do to you." Appellant said John's use of the word "he" was referring to the property owner, whom she initially called "Aboo" while saying she could not remember his "American name" and later remembered his name was Jay. Appellant told the dispatcher John worked for this property owner. The dispatcher inquired where she was in relation to John or the specified address. Appellant said she was "standing at the driveway" and "on the sidewalk." She also said John walked into the house when she told him she was calling the police.

{¶5} A responding police officer testified he was dispatched around 3:20 p.m. on March 12, 2024 to investigate a female's report of being threatened at a residence. In the driveway, the officer met John, described as an older male realtor who was preparing

to show a house for the property owner. The officer also met a "pretty irate, upset" female (Appellant) standing in front of that house. The officer determined there was no threat, as John simply told Appellant the property owner would not like the things Appellant was saying or doing at the property. (Tr. 23-24). He was unaware of any prior incident between Appellant and Jay or John. (Tr. 30). On cross-examination, the officer was asked if John said he "did not know what the owner would do to [the listener]," then might this reasonably be perceived as a threat to which the officer replied, "Someone could feel that way." (Tr. 33).

**{¶6}** A detective-sergeant who also responded to the 911 call testified Appellant was very agitated while claiming she had been threatened. He confirmed with the dispatcher that the call was placed to 911 and not to the ten-digit police line and decided to arrest Appellant after his investigation at the scene because "She was reporting an emergency that did not exist." (Tr. 36, 43-44). In addition to opining there was no emergency, he found John's statement was not a threat, opining John seemed credible and Appellant's interpretation of the statement made no sense. (Tr. 37, 46). As to the resisting arrest charge, the detective-sergeant said when he announced Appellant was under arrest for misuse of the 911 system and began to handcuff her, she became more agitated and began to spin, tense her arms, and lower herself. (Tr. 37).

**{¶7}** Each officer's body cam video was played for the court. (St.Ex. 2 & 3). When they arrived, John was standing in the middle of the driveway of the specified house where he was working and Appellant was standing on the sidewalk very close to the driveway. When the detective-sergeant asked how he could help, John pointed to Appellant, who said she was the person who called. She told the officer John worked for "Aboo" or Jay, the owner of the house where they were standing. She said her male friend lived next door to Jay's house, she owned a rental house next door to her friend's house, and she lived in Pennsylvania. According to Appellant, she called 911 because John stood on the front porch of Jay's house and threatened her by saying, "I don't know what he'll do to you" (with "he" referring to Jay).

**{¶8}** The video depicts John's demeanor as calm, friendly, and somewhat bewildered by Appellant. John was 68 years old and wearing a shirt announcing he was the "Grandpa" of a student at the local university. John could be heard telling the detective

he was showing the house for Jay because it was vacant. He said Appellant regularly takes the license plate number of every car that enters the driveway but usually does not talk to him. John reported Appellant was "walking up and down" swearing at him and calling him "idiot," "f word," and "c-word." John indicated Appellant said something disparaging about Jay's Indian descent, prompting him to ask her to stop making fun of Jay and his family while telling Appellant he "can't control Jay."

{¶9} The video footage then depicts the detective informing Appellant the purpose of her 911 call seemed unclear because John said he was just there to show the house when she came over and started calling him names. Appellant did not dispute this but said she only swears at him if he starts talking to her. John disclosed he initially informed her that he would only be at the property for half an hour and then "you're off the clock" (apparently joking about her license plate recording and other surveillance efforts). Appellant agreed this might have prompted her to call him a "c-word" while noting this is a free country allowing her to swear at him when she wanted.

{¶10} Appellant then opined, "He reminds me of someone who is a rapist" and told John, "that's your personality." In response, John noted, "They can run my record." Appellant responded, "They can run my record too. I worked for a senator. I worked for a D.A.'s office. I have my Utah gun permit." John voiced his wonder about what he ever said to prompt her wrath, and Appellant said, "I think you're white trash honey."

{¶11} Finally, the body cam footage additionally depicted the detective confirming Appellant's call was placed to the 911 line rather than to the ten-digit police line. After he announced Appellant was under arrest for misuse of the 911 system, a brief struggle to handcuff her ensued.

{¶12} The state then presented John's testimony. He said he occasionally visited the subject property to wait for workers or to show the house to tenants for Jay (the property owner and his friend). He testified Appellant would often walk in front of the house, take license plate numbers, call him names such as the "c word," and say Jay should "go back to where he came from." (Tr. 48-49, 52, 54).

{¶13} John testified on the day in question, he declared, "Listen. Call me all the names you want, but I don't know if Jay would like - - you know, what he would say if you told him to go back to where he came from." At that point, Appellant said, "Are you

threatening me? Are you threatening me?" According to John's testimony, he said no, but she nevertheless announced she was calling the police. (Tr. 49). John said Jay was not present at the house and he knew of no prior interactions between Appellant and Jay. (Tr. 48, 52).

{¶14} After unsuccessfully moving for acquittal, Appellant testified in her own defense. She said she lives in Pennsylvania, rents out a house on Tenney Avenue to a tenant, and has a boyfriend who lives at a different address on Tenney Avenue. She spoke of the sequential history of the subject property before Jay purchased it (stating it was vacant for four years, was broken into, had animals living in it, and was obtained by the government due to back taxes). (Tr. 63-64). She also mentioned keeping watch on the neighborhood because her boyfriend had items stolen from his backyard at some past time. (Tr. 64, 75).

{¶15} Defense counsel asked Appellant about her prior interaction with Jay after he purchased the property. She claimed "months before" the day of her 911 call, Jay was painting his house and he "lunged" at her as if to hit her. (Tr. 64, 69). She added, "when I would take the license plate down, he would – there was a couple times when he went like . . ." Her attorney asked, "Be like lunging at you?" to which she replied, "I wouldn't call that a lunge. He was just—he would just like step forward." She said she did not have "words with" Jay. (Tr. 70).

{¶16} Regarding John, Appellant testified, "I would go to take license plates. Sometimes he would say – like he said, he would say hi or what – whatever, to initiate—start conversation or—and I would just ignore him . . ." or he would engage in "teasing" her from the porch by asking, "oh, did you make sure you got the license plate," which she equated to "kids in high school" or "borderline harassment." (Tr. 66-67). As to the day of the 911 call, she testified feeling threatened when John stated, "I don't know what Jay would do to you." (Tr. 67-68). She claimed she believed it constituted an emergency while acknowledging: Jay was not present; she did not think about Jay coming to carry out the threat; and John left the porch and entered the house when she said she was calling the police (while she walked from her boyfriend's driveway to stand on the sidewalk near the driveway of the house John entered). (Tr. 70, 75-76).

**{¶17}** The court found Appellant guilty of misuse of the 911 system. While noting there was probable cause to lawfully arrest her for the misuse of the 911 system offense, the court found her not guilty of the resisting arrest charge. The court suspended a thirty-day jail sentence and imposed one year of probation with an order to complete a mental health evaluation and follow any resulting recommendations. The within timely appeal followed.

<u>ASSIGNMENT OF ERROR ONE</u>

**{¶18}** Appellant sets forth two assignments of error, the first of which alleges:

"THE TRIAL COURT ERRED IN DENYING MS. CATALE'S CRIM.R. 29(A) MOTION FOR ACQUITTAL AS THERE WAS INSUFFICIENT EVIDENCE AS A MATTER OF LAW TO SUSTAIN A FINDING OF GUILTY OF A VIOLATION OF MISUSE OF 9-1-1 SYSTEM."

**{¶19}** Whether the evidence is legally sufficient to sustain a conviction is a question of law dealing with adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The standard for reviewing the sufficiency of the evidence to support a criminal conviction on appeal is the same as the standard used to review the denial of a motion for acquittal. *See State v. Williams*, 74 Ohio St.3d 569, 576 (1996); Crim.R. 29(A) (motion for judgment of acquittal based on insufficient evidence). An evaluation of witness credibility is not involved in a sufficiency review, as the question is whether the evidence is sufficient if it is believed. *State v. Yarbrough*, 2002-Ohio-2126, ¶ 79, 82; *State v. Murphy*, 91 Ohio St.3d 516, 543 (2001). Hence, sufficiency involves the state's burden of production rather than its burden of persuasion. *Thompkins* at 390 (Cook, J., concurring).

**{¶20}** In reviewing the sufficiency of the evidence, the court views the evidence, including reasonable inferences, in the light most favorable to the prosecution to ascertain whether a rational juror could have found the elements of the offense proven beyond a reasonable doubt. *State v. Goff*, 82 Ohio St.3d 123, 138 (1998); *see also State v. Filiaggi*, 86 Ohio St.3d 230, 247 (1999) (reasonable inferences are viewed in favor of the state); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (consider all evidence in the light most favorable to the prosecution, including reasonable inferences). Circumstantial evidence

inherently possesses the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485 (2001).

**{¶21}** The offense for which Appellant was convicted has the following elements: "No person shall knowingly use the telephone number of the 9-1-1 system established under Ohio R.C. Chapter 128 to report an emergency if he knows that no emergency exists." Campbell City Ord. 537.12(b), (e)(1) (a fourth-degree misdemeanor). The knowingly mens rea is statutorily defined as follows:

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

R.C. 2902.22(B).

**{¶22}** In challenging whether the facts were sufficient to show she knew no emergency existed, Appellant cites cases involving violations of similar laws. She distinguishes her case from those involving multiple calls, threats by the caller, or false reports about the facts constituting the reason for which the call was made. She emphasizes cases where an appellate court reversed after finding inadequate evidence on the elements of misusing the 911 system.

**{¶23}** In one case, the Fifth District found a defendant should not have been charged when he called 911 to say, "We need a new sheriff." *State v. Link*, 2003-Ohio-6798, ¶ 17 (5th Dist.), citing former R.C. 4931.49. The court focused on the language "to report an emergency" and found that was not why he called. *Id.* at ¶ 16-17. In another case, the defendant called 911 to complain about a police officer stepping onto his property to look at cars in the driveway while ascertaining ownership (in response to a complaint about junk vehicles). *State v. Barron*, 141 Ohio App.3d 600, 601 (2d Dist. 2001). As the defendant informed the 911 dispatcher he was calling to complain, the court strictly construed the statutory language against the state and found there was no

Case No. 25 MA 0023

evidence he called in order "to report an emergency . . ." *Id.* at 602-603 (and thus found no probable cause to lawfully arrest him for misuse of the 911 system).

**{¶24}** Similarly, the Twelfth District reversed a conviction where the defendant made no report because he hung up before the call was even answered by the 911 dispatcher. *State v. Echols*, 141 Ohio App.3d 556, 559 (12th Dist. 2001). Notably, however, the court first found, "the evidence and the reasonable inferences deducible therefrom, as shown by the record, were objectively susceptible to the determination of the trial court that the unusual events of December 19, 1999 did not create an emergency of the type contemplated by R.C. 4931.49(D)" and "the state of the evidence upon this issue precludes any interference by this court with the factual findings of the county court." *Id.* In reversing the conviction, the court focused on the "to report an emergency language and found the defendant "did not 'report' an emergency, either real or imagined, to anyone." *Id.*

**{¶25}** The portions of these opinions on insufficient evidence dealt with the element of "to report an emergency" and focused on the lack of alternative statutory language to cover the situation where the person calls for other reasons and is not requesting an emergency response. *See, e.g., Barron* at 602-603.[1] Here, it is undisputed Appellant knowingly used 911, and a rational fact-finder could conclude Appellant made the call "to report an emergency" as she clearly wished to summon emergency responders. She announced her intent to call the police to the person she was accusing, she called 911 to report being threatened, and she moved her position to await the responding police officers (so as to stand in front of the house at which the accused had the right to be and to which she had no affiliation).

**{¶26}** A more pertinent issue is whether John's statement was a non-emergency situation and whether Appellant knew this. According to Appellant, John said, "I don't know what he will do to you" (with "he" referring to the owner of the rental house who was not present and was having John show the house to tenants). The evidence demonstrated the context of this statement. Appellant walked over to record his license

---

[1] We note the applicable ordinance here, in addition to the pertinent elements on knowingly using 911 to report an emergency while knowing no emergency exists, has alternative elements constituting the misuse of the 911 system offense: "No person shall knowingly use a 9-1-1 system for a purpose other than obtaining emergency service." Campbell City Ord. 537.12(c).

plate number, he teased she would be "off the clock" soon because he would not be there long, she started cursing at him (acknowledging she called him a "c-word"), and she disparaged the owner of the house and his family based on their ethnicity, which prompted John's aforequoted statement. When she asked John if his statement was a threat, he told her no. According to Appellant's own report, John then went inside the house but she stayed outside watching the house, all while knowing the disparaged owner was not present. We refer to our Statement of the Case above for a more detailed recitation of the evidence presented at trial.

{¶27} The state adequately demonstrated there was no emergency when Appellant called 911. A rational trier of fact could conclude there was no threat and there was no emergency situation. Likewise, some rational fact-finder could conclude *Appellant knew* no emergency existed. She claims at the time she made the 911 call, she had a "reasonable, good faith belief" John threatened her in a manner she feared would actively escalate (based on prior interaction with Jay). She asserts her subjective belief is enough to justify the 911 call because the content of the call did not contain a false recitation of John's statement to her. However, she told the 911 dispatcher that John threatened her. Her credibility as to what she believed was a weight of the evidence question is discussed in the next assignment of error.

{¶28} For a sufficiency review, the question is merely whether "any" rational trier of fact could find beyond a reasonable doubt the elements contested on appeal. *State v. Getsy*, 84 Ohio St.3d 180, 193 (1998), quoting *Jackson*, 443 U.S. at 319. As pointed out above, reasonable inferences are evaluated in the light most favorable to the prosecution, and circumstantial evidence is no less important than direct evidence. *Goff*, 82 Ohio St.3d at 138; *Filiaggi*, 86 Ohio St.3d at 247; *Treesh*, 90 Ohio St.3d at 485. Some rational fact-finder could conclude Appellant subjectively believed there was a high probability that John's statement did not constitute a threat of future action by another, let alone an emergency, under the following scenario of this case: Appellant conducted herself in a manner prompting the recipient of her tirade to respond with an off-the-cuff comment in defense of a disparaged friend; she made an inquiry on whether the comment was a threat (through a type of agency argument on behalf of the speaker's friend, who was not even present); the speaker told her it was not a threat; and still, she made the decision to

call for police by dialing 911 instead of the direct number to the local police station. *See* R.C. 2902.22(B) (defining knowingly).

**{¶29}** Contrary to Appellant's argument, there was sufficient evidence she knowingly called 911 to report an emergency when she knew no emergency existed in violation of the city code. Accordingly, the trial court did not err in denying Appellant's motion for acquittal. This assignment of error is without merit.

<u>ASSIGNMENT OF ERROR TWO</u>

**{¶30}** Appellant's second assignment of error contends:

"IF THIS COURT FINDS THAT THERE IS SUFFICIENT EVIDENCE TO WITHSTAND A CRIM.R. 29(A) MOTION FOR JUDGMENT OF ACQUITTAL, THE TRIAL COURT'S FINDING OF GUILTY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND MUST BE REVERSED AND DISMISSED."

**{¶31}** Weight of the evidence concerns the effect of the evidence in inducing belief, and our corresponding review evaluates "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d at 387. The appellate court considers whether the state met its burden of persuasion. *Id.* at 390 (Cook, J., concurring) (as opposed to the state's burden of production involved in a sufficiency review).

**{¶32}** When a defendant argues a conviction is contrary to the manifest weight of the evidence, the appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 2011-Ohio-4215, ¶ 220, citing *Thompkins* at 387. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 2011-Ohio-6524, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.

**{¶33}** It is the trier of fact who occupies the best position from which to weigh the evidence and judge the witness' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "We therefore generally proceed under the premise that when there are two fairly reasonable

<u>Case No. 25 MA 0023</u>

views of the evidence or two conflicting versions of events, neither of which is unbelievable, we do not choose which one we believe is more credible." *State v. Carter*, 2017-Ohio-7501, ¶ 105 (7th Dist.), citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

**{¶34}** We incorporate our detailed presentation of the facts in our above Statement of the Case along with the review of the evidence in the prior assignment of error. The trial judge not only watched John and Appellant provide explanations to the responding officers at the scene, he also watched as they testified live at trial. It was within the trial court's province to assess credibility, weigh the evidence, and assign value to the various facts and circumstances and conclude Appellant knowingly called 911 to report an emergency when she knew no emergency existed in violation of the city code. After reading the transcript, listening to the 911 call, and reviewing the body cam footage, we conclude this is not the exceptional case where the judge lost his path in weighing the evidence and created a manifest miscarriage of justice so as to require a new trial. This assignment of error is overruled.

**{¶35}** For the foregoing reasons, the trial court's judgment is affirmed, and Appellant's conviction is upheld.

Waite, J., concurs.

Dickey, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Campbell Municipal Court of Mahoning County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**